**H. O. MERREN & CO., Ltd.**

v.

**A. H. BELO CORP. and The Dallas Morning News.**

Civ. A. No. 3-63-348.

United States District Court
N. D. Texas,
Dallas Division.
April 17, 1964.

**516**

Frank Bezoni, Perkins, Bezoni & Kirwan, Midland, Tex., and M. R. Irion, Dallas, Tex., for plaintiff.

Stanley Neely, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for defendants.

ESTES, Chief Judge.

H. O. Merren & Co., Ltd., an association engaged in general merchandising, shipping, etc., chartered under the laws of the Cayman Islands, British West Indies, a crown colony of Great Britain, instituted this civil libel action against A. H. Belo Corporation, a citizen of Texas, and The Dallas Morning News, a daily newspaper owned and published by A. H. Belo Corp. The requisite diversity of citizenship and amount in controversy are present, and the court has jurisdiction.

The amended complaint, filed March 31, 1964, charged that the defendants libeled the plaintiff through the publication of an article on May 30, 1963, captioned "Legal Loophole Lets Goods From U. S. Flow to Communists In Cuba", which article is set forth in full in Appendix "A".

Plaintiff claims: that defendants recklessly, wantonly and in utter disregard of plaintiff's rights, maliciously and falsely published the article without justification; that the article was libelous; that it was intended to damage plaintiff and to prejudice and inflame the public against plaintiff, resulting in loss of prestige and patronage; that defendant made no effort to verify or confirm the statements in the article, which constituted malice; that the article was "calculated to place Petitioner in the role of being an aid to Fidel Castro * * * and * * * to render Petitioner * * * a despicable and dangerous instrumentality and collaborator with the Fidel Castro regime." Plaintiff seeks $40,000 in actual damages for loss of shipping patronage, $5,000,000 general damages and $5,000,000 punitive damages.

Depositions of representatives of the parties and of a Customs officer have been filed.[1]

The defendants filed a Motion to Strike, and, subject thereto, an Answer denying that the article in controversy

1. Deponents were:
Edgar Duncan Merren, now deceased, former Board Chairman of H. O. Merren & Co., Ltd.; E. M. (Ted) Dealey, publisher and Chairman of the Board of The Dallas Morning News; Jack B. Krueger, Managing Editor of The Dallas Morning News; Sam G. Scott, Tampa agent for H. O. Merren & Co., Ltd., and his wife; Charles C. Light, Supervisor and Marine Officer of the office of the Collector of Customs of Tampa, Florida; Leo Hill, owner of Hills Business Service and Hillebaum of Tampa, Inc., former agent of H. O. Merren & Company; and Roger Baum, associated with Hills Business Service and Hillebaum of Tampa, Inc.

was libelous and asserting: (1) that the article contained no reference to plaintiff; (2) that the statements contained in the article were substantially true; (3) that the publication was privileged under common law and under Article 5432, Revised Civil Statutes of the State of Texas; (4) that the publication was procured and effected by plaintiff; (5) that the plaintiff made no request for retraction; and (6) that defendants relied on the reporter, Thayer Waldo.

The defendants have presented a Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure, with supporting brief. The motion urges that: (1) the language in the article complained of is not libelous and, as a matter of law, not reasonably susceptible of the meaning ascribed thereto by plaintiff; (2) the publication was invited and consented to by plaintiff and, therefore, as a matter of law, is not actionable; and (3) the article contains no reference to plaintiff. Plaintiff has replied to such motion by briefs.

The only material issues on the motion for summary judgment are whether the language in the article is capable of bearing the meaning ascribed to it by the plaintiff and whether the meaning so ascribed and carried is capable of being defamatory and actionable libel.

 The Texas law of libel controls in this diversity case; and, for the purposes of determining this motion only, it may be assumed that the appellations complained of referred to plaintiff and were untrue. Rawlins v. McKee (Tex. Civ.App., 1959), 327 S.W.2d 633, 635.

 The Court is to determine whether the language charged is ambiguous or unambiguous. Then, if the language is unambiguous, the Court must construe its meaning and determine whether it is reasonably capable of bearing the meaning ascribed to it by plaintiff; 36 T.J.2d § 166, p. 496; and, whether such language is capable of being defamatory. 36 T.J.2d § 156, p. 483. Clear language, manifestly wanting in a defamatory meaning and showing on its face that it is not actionable, must be

so construed by the court. 36 T.J.2d § 156, p. 484; Southern Pub. Co. v. Foster (Tex.Com.App., 1932), 53 S.W.2d 1014, 1016; Rawlins v. McKee (Tex.Civ.App., 1959), 327 S.W.2d 633; Houston Printing Co. v. Hunter (Tex.Civ.App., 1937), 105 S.W.2d 312, 316, aff'd 129 Tex. 652, 106 S.W.2d 1043 (1937); Albert Miller & Co. v. Corte (5 Cir., 1939), 107 F.2d 432.

The Court in Southern Pub. Co., supra, 53 S.W.2d p. 1016, said:

"* * * if the language used in the matter published is clear and unambiguous and manifestly wanting in a defamatory meaning and shows on its face that it is not libelous, it is the duty of the court to so construe the language."

The Court continued, quoting Newell, Slander and Libel (4th Ed.) page 291:

"Where the words can bear but one meaning, and that is obviously not defamatory, no innuendo or other allegation in the pleadings can make them so, and no action lies. No parol evidence is admissible to explain the meaning of ordinary English words, in the absence of special circumstances showing that the words do not bear their usual signification. 'It is not right to say that a judge is to affect not to know what everybody else knows—the ordinary use of the English language.'"

The Restatement of Law, Torts, § 614, p. 304, enunciates:

"In the determination of the question whether a given communication is defamatory, two questions may arise: first, whether the communication reasonably conveyed the meaning ascribed to it by the plaintiff (see Sec. 563), and, second, whether such meaning is defamatory in character (see Sec. 559). Under the rule stated in this Section, the court determines whether the communication is capable of bearing the meaning ascribed to it by the plaintiff and whether the meaning so ascribed and carried is capable of being defama-

tory. If the court decides against the plaintiff upon either of these questions, there is no further question for the jury to determine and the case is ended. If, on the other hand, the judge decides that the communication is capable of bearing a meaning which may reasonably be regarded as defamatory, there is the further question, for the jury, whether the communication was in fact understood by the recipient thereof in a sense which made it defamatory."

■ In this case neither party contends that the language is ambiguous and, for the purpose of determining the question of liability presented by defendants' Motion for Summary Judgment, there is no genuine issue as to any material fact. The langauge in the article, even if untrue, is not libelous under Art. 5430, Revised Civil Statutes of the State of Texas, as a matter of law. Where such is the case, summary judgment in defendants' favor is appropriate in libel actions. Pulvermann v. A. S. Abell Co. (4 Cir., 1956), 228 F.2d 797; Dyer v. MacDougall et al. (2 Cir., 1952), 201 F. 2d 265; Fletcher v. Evening Star Newspaper Co., 73 App.D.C. 303, 114 F.2d 582; 24 Mod.Dig. § 2515(f), pp. 953–956.

"Libel in Texas has an exclusive statutory definition." McCullagh v. Houston Chronicle Publ. Co. (5 Cir., 1954), 211 F. 2d 4, 5; 36 T.J.2d § 1, pp. 277–8.

Article 5430 Revised Civil Statutes of the State of Texas provides:

"A libel is a defamation expressed in printing or writing * * * tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, * * * and thereby expose such person to public hatred, ridicule, or financial injury."

■ To be libelous the publication must be defamatory in its nature and the language used, taken in connection with the facts and circumstances alleged, must be reasonably calculated to produce one or more of the results mentioned in the statutory definition. 36 T.J.2d § 6, pp. 285–6.

■ In determining whether the publication is actionable, the meaning is to be ascertained from the language used in the article as it is commonly understood. The language is given its plain, ordinary and natural meaning, i. e., the meaning that would be placed on it by the ordinary person who might read it. It is not given a strained interpretation nor the import which it might carry to a hypersensitive mind. The significant inquiry is the effect on the mind of the ordinary reader and the construction he would give it. 36 T.J.2d § 26, pp. 311–12; Southern Pub. Co. v. Foster (Tex.Com. App., 1932), 53 S.W.2d 1014; Express Pub. Co. v. Southwell (Tex.Civ.App., 1927), 295 S.W. 180; 33 Am.J. §§ 84–89, pp. 97–103; 36 Mod.Dig. § 19, pp. 561– 566. The language is to be taken as a whole and the body of the article construed in connection with its caption. 36 T.J. 2d § 27, p. 313; 36 Mod.Dig. § 19, p. 561.

■ It is universally recognized that an appellation may be quite false, abusive, unpleasant and objectionable to the designated party without being defamatory. Rawlins v. McKee (Tex.Civ.App., 1959), 327 S.W.2d 633, 635; McCullagh v. Houston Chronicle Publ. Co. (5 Cir., 1954), 211 F.2d 4, 5. Indeed, in reversing an Alabama libel award as in violation of the First Amendment of the Constitution, the Supreme Court recognized " * * * a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan (1964), 376 U.S. 254, 270, 84 S.Ct. 710, 721, 12 L.Ed.2d 1130.

■ The article by caption and internal comment points out that the activity discussed therein was legal. It is

not libelous to charge a person with doing a thing which he may legally and properly do; 33 Am.Jur. § 10, p. 44; 36 Mod. Dig. § 6(1), p. 543; although strong epithets are used in describing the activities. Golden North Airways v. Tanana Publ. Co. (9 Cir., 1955), 218 F.2d 612, 625, 15 Alaska 303.

Plaintiff does not directly allege that the article imputed the commission of a crime, which could constitute libel per se. 36 T.J.2d § 7, pp. 288–291. Indeed, the article says the activities are "technically legal". However, in plaintiff's supplemental brief it is contended that the article accuses plaintiff of violating the United States embargo against Cuba, but plaintiff points out no provision of any law or regulation which prohibits or makes it illegal for a British national to transship goods from the United States from British territory to Cuba.

While the Government of the United States severed diplomatic relations with the Government of Cuba in January, 1961[2], and an embargo on exports from the United States to Cuba, with certain exceptions, was invoked in February, 1962[3], the United States recognizes the government of which Fidel Castro is Premier as the Government of Cuba.[4]

The Supreme Court of the United States, on March 23, 1964, in invoking the Act of State doctrine to decline review under principles of international law of the legality of Cuban Expropriation legislation, remarked, in upholding the right of Cuba to have access to United States courts: "This Court would hardly be competent to undertake assessments of varying degrees of friendliness or its absence, and, lacking some definite touchstone for determination, we are constrained to consider any relationship, short of war, with a recognized sovereign power as embracing the privilege of resorting to United States courts. Although the severance of diplomatic rela-

tions is an overt act with objective significance in the dealings of sovereign states, we are unwilling to say that it should inevitably result in the withdrawal of the privilege of bringing suit. Severance may take place for any number of political reasons, its duration is unpredictable, and whatever expression of animosity it may imply does not approach that implicit in a declaration of war." Banco Nacional de Cuba v. Sabbatino et al. (1964) 84 S.Ct. 923.

Plaintiff was a British national engaged in trade and commerce under a charter issued by a British crown colony and it was a violation of no law, order or regulation for plaintiff to ship the goods referred to in the article from the Cayman Islands to Cuba. On deposition the former board chairman of plaintiff so testified. See Deposition of H. O. Merren, pp. 125–127, 216. The article in controversy was "fair comment" on a "matter of public concern"[5], which, under the First Amendment to the Constitution of the United States, the defendants had a right to publish even if in fact plaintiff had not engaged in such shipping.[6]

Comment on the lack of co-operation by the government of Great Britain or one of its nationals in making the United States embargo effective is not actionable libel. The Texas case of Brown v. Houston Printing Co. (Tex.Civ.App., 1923), 255 S.W. 254, without mentioning privilege held that it could never be libelous to state, erroneously or otherwise, openly or by innuendo, that a person supported political views which were great public issues of the day and on which large groups of citizens differed.

The plain and ordinary import which the article creates in the mind of an ordinary reader is simply a discussion of a "legal loophole". It certainly did not convey the impression to the ordinary reader that plaintiff ascribed to it; nor did it carry a meaning capable of being de-

2. 44 U.S.Dept. of State Bulletin No. 1126, p. 103.

3. 46 U.S.Dept. of State Bulletin No. 1182, pp. 283, 348; 43 U.S.Dept. of State Bulletin No. 1115, p. 715.

4. 42 U.S.Dept. of State Bulletin No. 1077, p. 237.

5. Art. 5432, Rev.Civ.Stat. of St. of Tex.

6. New York Times Co. v. Sullivan (1964) 84 S.Ct. 710, 721.

famatory to plaintiff. To hold that this publication is actionable libel would require this court to go further than have the courts of Texas.

As Judge Edgerton cautioned, speaking for a unanimous District of Columbia Circuit affirming the dismissal of a libel suit against a newspaper: "Whatever is added to the field of libel is taken from the field of free debate." Sweeney v. Patterson (1942), 76 U.S. App.D.C. 23, 128 F.2d 457, 458.

Mr. Justice Frankfurter has concluded: "The more issues of law are inescapably entangled in political controversies, especially those that touch the passions of the day, the more the Court is under [the] duty to dispose of a controversy within the narrowest confines that intellectual integrity permits." Joint Anti-Fascist Refugee Committee v. McGrath, et al. (1951), 341 U.S. 123, 149–150, 71 S.Ct. 624, 95 L.Ed. 817 (concurring opinion).

The Court, therefore, on considering the pleadings, depositions, and briefs on file; and after hearing counsel for the respective parties, and due deliberation having been had, is of the opinion that defendants are entitled to summary judgment in their favor dismissing the action; it is

Therefore, ordered, that Defendants' Motion for Summary Judgment be and the same hereby is granted, and that judgment be entered herein in defendants favor dismissing this action with costs and disbursements to be taxed by the Clerk in favor of the defendants and against the plaintiff.

APPENDIX "A"

COPY

8—Section 3
The Dallas Morning News
Thursday, May 30, 1963

LEGAL LOOPHOLE LETS GOODS FROM U. S. FLOW TO COMMUNISTS IN CUBA

By Thayer Waldo
Special to the News

Miami, Fla.—Although all trade between this country and Red Cuba is supposed to be cut off, the fact is that thousands of dollars worth of U.S. goods are flowing into Fidel Castro's totalitarian economy every month.

The loophole through which these clandestine—though technically legal—shipments are funneled is an island called Grand Cayman, a British Crown dependency in the Caribbean, about 300 miles southeast of Miami.

Such merchandise as flour, spare parts and equipment for motor vehicles, electrical supplies, etc., are regularly dispatched from Tampa in large quantities, aboard vessels operated by Grand Cayman firms, consigned to residents of that island.

HOWEVER, only a minute proportion of these goods is actually destined for Cayman consumption. The ships put in at George Town, the capital and chief port, just long enough to discharge 3 or 4 per cent of their cargoes, then carry the rest to Cuban south coast ports.

No one could be haled into any court for this trade—but it flagrantly violates Great Britain's promise to collaborate with our Cuban policy; and U.S. shippers cannot fail to be aware that the volume of merchandise they are embarking is fantastically large for the 5,000 population of Grand Cayman.

In 1961, for instance, the island's two bakeries supplied local demand for bread and pastries with 400 pounds of flour a month, imported from Haiti. Now flour shipments from Tampa to George Town consignees average 70,000 pounds monthly.

BRAKE LINING, batteries, bearings, spark plugs, copper tubing and miscellaneous automotive parts are loaded for the island at the Florida east coast port in quantities that would permit total re-equipment of all 208 vehicles on Grand Cayman every 15 days, with an ample stockpile left over.

More than 700,000 feet of heavy-duty electrical wire have ostensibly been sent there during the first four months of 1963. The island's normal consumption of that commodity is 8,500 feet a year.

Britain's central government seems to know little and care less these days about events in Grand Cayman and its smaller sister island, Cayman Braque. That attitude is largely an outgrowth of the on-again-off-again recent history of the British West Indies.

WHEN A WEST Indies Federation was formed, in 1956, the Caymans gave up their Crown dependency status to join it, as a protectorate of Jamaica. But the federation broke up within a few years. After Jamaica proclaimed its independence, Caymanians elected to go back to the old stand.

By then, with only a few scattered islands in the Caribbean still under its direct control, Whitehall no longer looked upon the area as a vital sphere. So the governorship of the Caymans was handed to Jack Rose, a World War II ace, Conservative party stalwart and a bon vivant who much preferred life in London to the provincial charms of George Town.

THROUGHOUT these changes Cayman economic affairs were dominated—as they had been for three generations past—by two families, the Merryns, of Welsh descent, and the invincibly Scottish McTaggarts. Hardly an enterprise worth naming on the two islands is not controlled, directly or indirectly, by one of these clans.

Over the years, the shrewd, conservative McTaggarts had gradually amassed more holdings and greater wealth than the rival family. But with the advent of Rose's absentee, laissez-faire governorship, the Merryns saw their chance.

Britain maintains relations with Communist Cuba; and despite Harold MacMillan's agreement to help John Kennedy cut down free world trade with Castro, no specific policy pronouncement on the subject had been issued by London—at least, none that ever officially reached Grand Cayman.

ABOUT SIX MONTHS ago, the Merryns tried transshipping one modest cargo of 40 car batteries to the Cuban port of Cienfuegos. The profit margin, with all expenses covered, was $2,320.

From that time on, the five cargo vessels owned or leased by the Merryn interests have plowed a steady sea row from Tampa to George Town to Cuba and back again. To date, nobody—here or in England—has made any attempt to halt the lucrative traffic, or even to ask embarrassing questions about it.

But the Merryns are now making considerably more money than the McTaggarts—and the McTaggarts don't care for that one bit.

As a result, it could be that Whitehall, the White House, or both will be publicly invited to look into a situation which they have so far ignored.