# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================

## NO. 03-05-00566-CV

========================

**Jeri Lynn Ross Skipper and Robert Boyd Skipper, Appellants**

**v.**

**Valerie Meek, William C. Meek, Lauren Robins, and
Arts from the Heart, Appellees**

========================================================================
### FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT
### NO. 02-1793, HONORABLE RONALD G. CARR, JUDGE PRESIDING
========================================================================

## M E M O R A N D U M   O P I N I O N

In this defamation suit filed by appellants Jeri Lynn Ross Skipper and Robert Boyd Skipper (the "Skippers") against appellees Valerie Meek, William C. Meek, Lauren Robins, and Arts from the Heart, the Skippers appeal the trial court's rendition of a no-evidence summary judgment in favor of the appellees. Because the Skippers failed to produce sufficient evidence to raise a fact issue on the elements of their claims, we affirm the summary judgment rendered by the trial court.

## FACTUAL BACKGROUND

Founded in 1998 by Valerie and William Meek and Lauren Robins, Arts from the Heart ("AFTH") is a local, non-profit organization in Wimberley that provides art programs to the city's youth. The organization is funded by donations and grants, including a grant from the Texas

Commission on the Arts. Valerie Meek served as executive director of the organization. In 2002, the organization provided after-school workshops at various campuses in town, including a chess club and workshop. Jeri Skipper served on the AFTH board along with William Meek and Lauren Robins. Robert Skipper taught chess in after-school workshops for elementary and middle school students. He maintained a personal website on the Internet, referencing the chess club, chess activities, and other personal interests.

On April 25, 2002, Jeri Skipper sent a year-end e-mail message to chess club parents identifying the children who would be receiving trophies and commenting,

> It has been a tough semester for scheduling and working through things. For those of you who read THE ONION online, you may agree with this recent headline: What does not kill me makes me whinier.

Following the Skippers' names and telephone contact information, the message contained a reference to Robert Skipper's website which contained a link to the chess club. On the website, in addition to a link to the home page for the AFTH chess club, Robert Skipper included a list of "favorite links." The favorite links included websites for The Onion, a satirical publication, and Snopes, also known as the Urban Legends Reference Pages.

Lauren Robins, the board vice president, learned of the Skippers' website from board president Barbara Day who received Jeri Skipper's e-mail. After viewing the website, Robins alerted another member of the board. Concerned that both links contained mature-content material, Robins attempted to call Jeri Skipper but was unable to reach her. Later that evening, she encountered Jeri Skipper at a play at the local theater and they engaged in a contentious conversation about the

2

website.  Jeri Skipper told Robins that she had never read The Onion and acknowledged that the reference to it in her e-mail was a mistake.  Robins also had a heated exchange with Robert Skipper.  As Robins explained that the linked sites contained inappropriate materials for children, Robert Skipper accused Robins and the AFTH board of harassing him and his wife.  Robins memorialized the encounter with the Skippers in a memorandum dated May 1.[1]

On May 4, the AFTH executive committee—composed of Day, Robins, Valerie Meek, and the board secretary, Donna Gaddie—met and, after seeking legal advice, forwarded a letter to the Skippers requesting the removal of the link for the AFTH chess club from the Skippers' website and disassociating the Skippers from the organization.  The letter also stated,

> When the existence of this unauthorized Art From The Heart Chess Club home page came to our attention yesterday, we also discovered that you have linked it on the Skipperweb website, under the heading of "Favorite Links," to a website which is not intended for readers under 18 years of age.  We have serious concerns about your having done this.  As an organization serving youth we absolutely can not allow an individual(s) to associate our organization's name in their advertisement or

---

[1] In her memorandum, Robins described "attempted conversations and conversations with Jeri Skipper and Robert Skipper on April 25, 2001[sic]."  She wrote,

> That afternoon I had been told by Barbara Day, President of the Board of Arts from the Heart (AFTH), of an email letter sent from Jeri and Robert Skipper to the parents of the children in the Chess Club.  In the email was a reference to a website called the Onion.  When I was read the contents of the web site I found them lewd and offensive and certainly not something that should be affiliated with AFTH.  Immediately, I called Jimmy Ash, a member of the Board of AFTH and someone who had been able to communicate with Jeri, and told him of the situation.  He said he'd check into it.  I suggested we call Marion Running and he suggested I speak with Jeri first.  I then tried Jeri.  Once I left a message on the answering machine asking Jeri to give me a call; the second time I called, her daughter said that Jeri was "unavailable."  Robins then described her encounter with the Skippers at the theater that evening.

promotion of websites not intended for minors. We will not allow anyone, under the auspices of Arts From the Heart, to expose students enrolled in one of our programs to the type of information found on the linked website of concern. We ask for your prompt attention to correcting this matter.

Attached to the letter were a printed copy of the contents of the Skippers' homepage, excerpts from The Onion and Snopes websites,[2] Jeri Skipper's April 25 e-mail, Robins's May 1 memorandum, and a three-page excerpt of chapter 43 of the Texas Penal Code relating to offenses involving obscenity. The letter and attachments were identified in the pleadings and summary judgment evidence as Exhibit A.

Jeri Skipper responded to the letter by e-mail on May 6 with a copy to AFTH board members:

I am unaware of the existence any [sic] Executive Committee, and I disagree with your description of the facts below; however, Robert took care of this request immediately following an unpleasant exchange over the phone with board member Bill Meek on Friday night, the day before you wrote this.

[The website] has been online for five years (two of those supporting the AFTH chess program.) This is the first complaint we have had, and Robert dealt with it right away. All you had to do was ask. . . . I'm sorry you went to so much trouble and expense to draft this letter and send it registered mail. It was unnecessary.

---

[2] The excerpts included five pages of the April 24 and May 1, 2002 on-line editions of The Onion with headlines that included "Car Salesman Three Desks over Going On And On About Chick He Banged Last Night,"and "Teen Sex Linked to Drugs and Alcohol, Reports Center for Figuring Out Really Obvious Things"; and six pages from the May 6, 2002 on-line edition of Snopes.com containing a reference page for "Sex" that included hyperlinks to sections on "adultery, aphrodisiacs, bestiality, caught in the act, celebrities, high school confidential, homosexuality, juvenilia, kinky sex, mistaken identities, penile pranks, pornography, pregnancy, prostitution, revenge, and tattled tales," along with other mature-content material.

I took the liberty of copying the rest of the board members in this reply, since you apparently forgot to do that in your email to us. If I were in their shoes, I would want to know.

Because AFTH provided its programs through the schools and the Skippers' website also contained a link to the Wimberley Independent School District, on May 8, Valerie Meek and Robins met with school superintendent Dr. Marian Running and provided her a copy of the Exhibit A materials. They discussed with Running the inappropriateness of the website links and whether they should notify the parents of the chess club members. Dr. Running was able to access and view the linked websites only after overriding the district's filtering software.

Dr. Running in turn was concerned that the Skippers' website contained links to the school district as well as to St. Mary's University where Robert Skipper teaches. She contacted Robert Skipper's department chair by e-mail, advising that "we are doing what we need to to get him to take off the WISD link that he calls unofficial." Finding that the links "seem to be of questionable value, and in poor taste," by memorandum dated May 13, Skipper's department dean instructed him to remove all inappropriate websites and linkages. Running also spoke with Robert Skipper about removing the school district link, and he agreed to remove it. The Onion and Snopes links were removed from the Skippers' website.[3]

The Skippers sued Valerie Meek, William Meek, Lauren Robins, and AFTH, claiming appellees had defamed them by making statements that the Skippers "were promoting pornography and/or obscenity to children in the course of operating a chess club." Specifically, in

---

[3] In their petition, the Skippers assert that the "all of the links" complained of were removed by May 13.

5

their amended petition, the Skippers alleged that appellees made the following false and defamatory "oral and/or written" statements:

- the Skippers "were engaged in criminal sexual behavior in the course of operating a chess club";

- the Skippers "were promoting pornography and/or obscenity to children in the course of operating a chess club";

- the Skippers "encouraged, promoted, referred and/or directed children to go to The Onion or The Urban Legends Reference Pages, or 'Snopes,' websites";

- by the links, the Skippers "were exposing and subjecting children to obscene and/or pornographic material";

- by the links, the Skippers "violated criminal sexual statute(s) of the State of Texas";

- that the Skippers "promoted, encouraged, and/or directed children to go to [the website];

- that "any child visited The Onion or Snopes websites as a result of an act" of the Skippers;

- that "pornography and/or obscenity were accessible from the Chess Club webpage maintained by Robert Skipper";

- that the Skippers "promoted obscenity and/or pornography"; and

- that the Skippers by having links to The Onion and Snopes websites on their website "promoted pornography."

The Skippers allege that these statements are contained in Exhibit A which is attached to the amended petition. In their petition, the Skippers allege that Valerie Meek first published "a packet of material" known as Exhibit A to her husband and fellow board member, William Meek. Valerie Meek and Lauren Robins then published Exhibit A to Dr. Running at their meeting at the

6

school district office. The petition then alleges that Dr. Running published an e-mail to Robert Skipper's department chair at St. Mary's. The final complained-of publications occurred when Lauren Robins and William Meek published Exhibit A to others.

After extensive discovery, appellees filed a no-evidence motion for summary judgment asserting, *inter alia,* that (i) the statements were not defamatory; (ii) any statements made regarding the Skippers were true; (iii) the statements were not published to a third person; (iv) any statements were made without actual malice, or the Skippers failed to show the statements were made without the requisite degree of care; and (v) the Skippers have no evidence to support any of the elements of the causes of action alleged. In their motion, appellees particularize each element of the causes of action challenged. The trial court granted the motion without stating a specific ground. This appeal followed.

## ANALYSIS

### *Standard of Review*

After adequate time for discovery, a party may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. Tex. R. Civ. P. 166a(i). The motion must specify which essential elements of the opponent's claim or defense lack supporting evidence. Once the party seeking the no-evidence summary judgment files a proper motion asserting that there is no evidence of an element of a claim on which the non-movant would have the burden of proof at trial, the burden then shifts to the non-movant to bring forth evidence that raises a fact issue on the challenged element. *See Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 71 (Tex. App.—Austin 1998,

7

no pet.).  To raise a genuine issue of material fact, the non-movant must set forth more than a scintilla of probative evidence as to each challenged element.  Tex. R. Civ. P. 166a(i).

In reviewing a summary judgment, we assume all the evidence favorable to the non-movant is true, indulge every reasonable inference in favor of the non-movant, and resolve any doubts in favor of the non-movant.  *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).  When, as here, the trial court's order does not specify the ground or grounds on which summary judgment is rendered, we will affirm the summary judgment if any of the grounds stated in the motion is meritorious.  *See State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993); *Basic Capital Mgmt., Inc. v. Dow Jones & Co.*, 96 S.W.3d 475, 480 (Tex. App.—Austin 2002, no pet.).

### Defamation

The Skippers contend that the letter requesting removal of the AFTH link from the Skippers' website and terminating their association with AFTH, when read in context with its attachments, accuses them of promoting pornography and obscenity to children under their direction and exposing or subjecting children to "sexual conduct."  They assert that "Exhibit 'A,' as a whole, falsely publishes that the Skippers promoted and advertised the sexual conduct that is reflected in the excerpts from the Onion and the Snopes websites."  The Skippers assert causes of action for libel, slander and conspiracy.[4]  They allege the same statements were made "orally and/or in writing," and

---

[4] Because the conspiracy claim is premised on the libel and slander claims, our resolution of the defamation causes of action necessarily disposes of the conspiracy claim.  *See Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex. 2001)

that the statements were reduced to writing and communicated in written form as Exhibit A. Appellees respond that the alleged statements were not defamatory nor made with malicious or negligent intent. They also urge that the statements were not false and were statements of opinion.

Libel and slander are both forms of defamation. *Austin v. Inet Techs, Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.). Slander is a false oral statement about an ascertainable person that is published to a third person without legal excuse. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). Libel is defamation expressed in written form. Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 1997).

To prove a cause of action for defamation, a plaintiff must prove that (1) the defendant published a statement of fact, (2) the statement was defamatory, (3) the statement was false, (4) the defendant acted negligently in publishing the false and defamatory statement,[5] and (5) the plaintiff suffered damages as a result. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). The initial issue for our determination is whether the words used were "reasonably capable of a defamatory meaning." *Musser v. Smith Protective Servs.*, 723 S.W.2d 653, 654 (Tex. 1987). Here, the issue is whether the language in Exhibit A is capable of bearing the meaning ascribed to it by the Skippers and whether that meaning is capable of a defamatory meaning. *See id.*; *H. O. Merren & Co., Ltd. v. A. H. Belo Corp.*, 228 F. Supp. 515, 517 (N.D. Tex. 1964), *aff'd,* 346 F.2d 568 (5th Cir. 1965).

---

[5] Defamatory statements are "published" if they are communicated orally, in writing, or in print to some third person capable of understanding their defamatory import and in such a way that the third person did so understand. *Austin v. Inet Techs, Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.); *Abbott v. Pollock*, 946 S.W.2d 513, 519 (Tex. App.—Austin 1997, writ denied).

9

Whether a statement is defamatory is a question of law to be determined by the court. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989); *Musser*, 723 S.W.2d at 654; *Abbott v. Pollock*, 946 S.W.2d 513, 519 (Tex. App.—Austin 1997, writ denied). We construe as a matter of law language that is unambiguous on its face and find it not actionable if it lacks a defamatory meaning. A jury should only be permitted to determine the statement's meaning and the effect on the listener if the language is ambiguous. *Abbott*, 946 S.W.2d at 519-20; *see also Turner*, 38 S.W.3d at 114; *Musser*, 723 S.W.2d at 655.

An allegedly defamatory statement "should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement." *Turner*, 38 S.W.3d at 114; *see also Musser*, 723 S.W.2d at 655. Whether a statement is defamatory depends upon the meaning a reasonable person would attribute to a publication, and not to a technical analysis of each statement. *Turner*, 38 S.W.3d at 116; *Abbott*, 946 S.W.2d at 520. Language is to be given its plain, ordinary, and natural meaning. *H. O. Merren*, 228 F. Supp. at 518. If the reader must struggle to see how and whether the words defame, as a matter of law the words are not defamatory. We may not permit a forced and strained interpretation in order to obtain an innocent reading or a libelous one. *Id*. at 517.

A statement is defamatory if it tends to injure the person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury, or if it tends to impeach that person's honesty, integrity, or virtue. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 1997); *see also Basic Capital Mgmt.*, 96 S.W.3d at 480; *Abbott*, 946 S.W.2d at 519; *Free v. American Home Assurance Co.*, 902 S.W.2d 51, 54 (Tex. App.—Houston [1st Dist.] 1995, no writ). A

10

communication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that hurts only the plaintiff's feelings, is not actionable. *H.O. Merren*, 228 F. Supp. at 518; *Rawlins v. McKee*, 327 S.W.2d 633, 635 (Tex. Civ. App.—Texarkana 1959, writ ref'd n.r.e.); *see* 1 Robert D. Sack, Sack on Defamation § 2.4.1 at 2-12 (3d ed. 2006).

Indeed, the allegedly defamatory statements themselves are elusive in this case. In their original petition, the Skippers claim two published statements—that Valerie Meek and Lauren Robins stated "orally and/or in writing" that "the Plaintiff [sic] was engaged in criminal sexual behavior" and "was promoting pornography to children" in the course of operating a chess club affiliated with AFTH. They asserted ten statements "orally and/or in writing" in their amended petition. In their response to the motion for summary judgment, the Skippers included thirteen statements. In their brief on appeal, they reference several pages of alleged statements identified in their response to the original motion. We will confine our discussion to the statements set forth above and alleged in the amended petition, which is their live pleading.

Although the essence of the Skippers' complaint is the Exhibit A material, the statements alleged in their petition to be defamatory do not appear in Exhibit A. As they state in their response to the motion for summary judgment, "Exhibit 'A' holistically makes many statements." With respect to each "oral and/or written" statement in the amended petition as set forth above, the Skippers claim that "[a]s a whole" Exhibit A makes that particular statement and "it is spun into criminal conduct." With the juxtaposition of the letter and attachments, the Skippers claim that Exhibit A makes the statement that the Skippers were engaged in criminal sexual behavior and promoting obscenity to children.

11

A fair reading of Exhibit A does not yield a defamatory meaning to the words as they were used verbatim or in their context. The May 4 letter from the executive committee simply states that the Skippers were not authorized to include the AFTH link on their website and that the link to mature-content websites is inappropriate. The inclusion of excerpts from the linked websites and relevant statutory material does not alter the meaning of the letter or convert the communication into an accusation that the Skippers have committed a crime. The letter—even with attachments—does not accuse the Skippers of any crime or question their honesty, integrity, or virtue. The criticism is related to the Skippers' work with AFTH, which is a natural and proper concern of the executive committee members. On its face, the letter was an admonishment, and the attachments of the website excerpts and penal code provisions provided the context for the committee's concerns. The inclusion of The Onion and Snopes excerpts makes it clear that it is the linked websites—and not the Skippers' website—that contain the mature-content materials and are of concern to the board.

Giving Exhibit A its plain and ordinary meaning, the committee merely lodged an objection to the unauthorized use of the AFTH chess club link juxtaposed to links facilitating access to websites containing mature-content material. The attachment of the website excerpts served to highlight the objectionable material found on the websites and not to accuse the Skippers of being purveyors of the material.

In his deposition, William Meek testified that he called Robert Skipper immediately after viewing an excerpt from The Onion website. Testifying that he did not think it was Robert Skipper's intent to promote the pornography on the linked websites, Meek called Skipper because the mature-content material was made available to children, "by accident or not." "What I said was

12

that there was a site that linked Arts from the Heart to adult literary stuff that was x-rated and adult oriented. I never made comments or observations that I felt like it was promoting pornography." Meek stated that he "felt like if a parent saw it with his child and was irate enough to cause a big stink in a town that small, yeah, it could undermine the whole organization." Likewise, Lauren Robins testified that she was concerned about the content of the two websites, that she thought the material on the two websites was obscene, and that the executive committee consulted a lawyer: "We were confused about what our—how we could protect the students and what our liability would be if a parent found out about this connection to the Skipper website." At her deposition, Valerie Meek testified that the board was concerned that children might discover the websites through the Skippers' links and thought it inappropriate that the links be included on a website also containing a link to the AFTH chess club. She testified that she feared the organization could lose its funding from the Texas Commission on the Arts.

Reading Exhibit A verbatim or in its entirety, we cannot say that it conveyed the statements to the ordinary reader with the defamatory meaning that the Skippers ascribed to it; nor may the statements be fairly or reasonably read to ascribe a defamatory meaning. *Cf. Greenbelt Pub. Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970) ("No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging [the plaintiff] with the commission of a criminal offense."). The Skippers assert that the statements accuse them of engaging in sexual behavior and promoting pornography to children and that the inclusion of copies of the obscenity chapter of the penal code converts the communication into an accusation that they have committed a crime. No reasonable person, reading the letter with the attached materials, would

13

conclude that the Skippers were being accused of engaging in illegal activity. *Musser*, 723 S.W.2d at 655. In this case, the trial court properly rejected the Skippers' attempt to transform permissible speech into actionable defamatory statements.

Moreover, the Skippers have not raised a fact question as to whether the actual statements published by appellees are either true[6] or constituted only opinion,[7] and are, therefore, not actionable. A cause of action for libel arises when one publishes a false defamatory statement of fact. *Abbott*, 946 S.W.2d at 519. For a statement to be actionable in defamation, it must expressly or impliedly assert facts, and the facts must be objectively verifiably false. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990). Appellees claim that the Skippers are unable to adduce evidence that any of the statements were false or that they were statements of fact as opposed to statements of opinion. The Skippers were required to come forward with sufficient facts to raise a fact issue concerning the falsity of the complained-of statements. *See KTRK Television v. Felder*, 950 S.W.2d 100, 105 (Tex. App.—Houston [14th Dist.] 1997, no pet.). This they failed to do.

In the letter, the executive committee members expressed "serious concerns" over Skipper's inclusion of The Onion and Snopes websites which were "not intended for readers under 18 years of age." They also expressed their concerns that students enrolled in their programs could be exposed to the "type of information found on the linked website[s]." Exhibit A contains two

---

[6] *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (private plaintiff required to prove falsity in order to protect utterance of "truth"); *Randall's Food Mkts. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995); *Basic Capital Mgmt., Inc. v. Dow Jones & Co.*, 96 S.W.3d 475, 480 (Tex. App.—Austin 2002, no pet.).

[7] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 40 (1974) (assertions of fact are actionable); *El Paso Times, Inc. v. Kerr*, 706 S.W.2d 797, 798 (Tex. App.—El Paso 1986, writ ref'd n.r.e.).

categories of statements allegedly made by appellees: the first category involves statements that the website contains links to inappropriate material, and the second involves appellees' opinions regarding the improper nature of the website links. The Skippers presented no evidence to show that these statements were false or, with regard to the second category, that the statements were anything other than appellees' opinions. The Skippers have failed to carry their burden to raise a fact issue as to these challenged elements.

## CONCLUSION

Because the Skippers failed to produce summary judgment evidence raising a genuine issue of material fact as required by Rule 166a(i), and the alleged statements were not defamatory as a matter of law, we conclude that the district court properly rendered judgment in favor of the appellees. Having determined that the trial court did not err in granting appellees' motion for summary judgment, we affirm the judgment of the trial court.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: July 21, 2006

15