# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-02-00184-CV

---

**Basic Capital Management, Inc., Appellant**

**v.**

**Dow Jones & Company, Inc., d/b/a *The Wall Street Journal*, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
NO. GN003093, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

---

In this defamation suit filed by appellant Basic Capital Management, Inc. (ABCM@) against Dow Jones & Company, Inc., doing business as *The Wall Street Journal*, we address whether statements in articles published by Dow Jones characterizing a federal indictment are substantially true and therefore not actionable. The district court granted summary judgment in favor of Dow Jones, dismissing BCM=s claims of libel and business disparagement. On appeal, BCM challenges the granting of summary judgment, contending that Dow Jones failed to establish that (i) the complained-of statements were true or substantially true, (ii) BCM was a public figure, and (iii) Dow Jones was not negligent. Because we conclude that the statements characterizing the indictment were substantially true as a matter of law, we affirm the judgment of the district court.

**FACTUAL AND PROCEDURAL BACKGROUND**

**The Indictment**

On June 14, 2000, the United States Attorney=s Office for the Southern District of New York unsealed indictments alleging that members of the five largest crime families in New York, along with other individuals in various parts of the country, engaged in a massive conspiracy to manipulate stock prices. The 107-page indictment at issue here alleged that twenty-three defendants associated to form a racketeering enterprise that engaged in Asecurities fraud, wire fraud, pension fund fraud, illegal kickbacks to union officials, extortion, money laundering, bribery, witness tampering, and murder solicitation.@ Count One of the indictment described the Ameans and methods@ of the enterprise, alleging that the defendants sought to enrich the enterprise through securities fraud and wire fraud, and to conceal and promote the enterprise=s unlawful activities by laundering proceeds of the scheme.

Although BCM, a Dallas real estate investment firm, was not a named defendant, it was identified as an actor in a pension fund fraud and kickbacks scheme set forth in Count One of the indictment. Specifically, the indictment identified a stock offering by American Realty Trust, a real estate investment trust controlled by BCM, as a Afraudulent investment[] that appeared to be [an] investment[] suitable for pension funds and that w[as] designed to appear legitimate.@ The indictment further alleged that BCM Aagreed with the enterprise to cause American Realty Trust to issue a series of preferred stock@ and Afurther agreed with the enterprise@ that for every $10 million in stock sales, BCM Awould cause approximately $2 million of the proceeds to be paid secretly to the enterprise.@

2

Included in the list of the twenty-three defendants were Gene Phillips and A. Cal Rossi, who the indictment identified as associated with BCM. The indictment alleged that Gene Phillips "secretly controlled" BCM and agreed with members and associates of the enterprise "to defraud union pension funds in connection with the sale of American Realty preferred stock." The indictment further alleged that Cal Rossi, as managing director of capital markets for BCM, "structured the fraudulent . . . [s]tock offering" and "agreed that a portion of the offering proceeds would be used to pay secret bribes to union officials." Phillips and Rossi were named as defendants in several counts of the indictment, including Count One.

**The *Wall Street Journal* Articles**

On June 15, the day after the indictments were unsealed and arrests were made, the *Journal* ran the first of three articles that named BCM and discussed the allegations contained in the indictment. On June 20 and June 27, following press releases issued by BCM, the *Journal* ran follow-up articles.[1]

**June 15**

In its "Heard on the Street" column, the *Journal* published an article entitled "Stock-Fraud Case Alleges Organized-Crime Tie" and "Prosecutors Say Stocks Of 19 Firms Were Manipulated." Reporting on the charges against 120 defendants, the article described "the largest one-day securities-fraud

_____

[1] BCM challenges statements contained in the June 20 and June 27 articles, but none in the initial article on June 15.

3

indictment ever,@ alleging various stock manipulation schemes involving microcap stocks and Adot.coms.@

Recounting a scheme in the indictment to issue fraudulent stock and pay kickbacks to corrupt union officials,

reporters for the *Journal* wrote:

> The mob=s alleged racketeering enterprise also sought to defraud union pension funds by structuring investments that allowed for secret kickbacks to corrupt union officials, the charges said. One of them, officials said, was a preferred stock offering of American Realty Trust, a real-estate investment trust listed on the New York Stock Exchange, allegedly arranged through Gene Phillips, who controlled Basic Capital Management, the Dallas investment adviser to the REIT.
>
> In a statement, Basic Capital, which manages $2.5 billion and advised four publicly traded real-estate companies, said Mr. Phillips and another key executive were Aout of the country,@ one on vacation and the other on business. AWe are shocked and surprised@ by the news, the company said.

**June 20**

Stock in publicly traded companies affiliated with BCM fell sharply after the indictment was

released. As a result, BCM received margin calls**, then on June 19 issued a press release that it might**

**default on $37 million in obligations. An** assistant reporter with the *Journal*=s Dallas bureau received

the June 19 press release about the margin calls. She called BCM for an interview, but its director of

investor relations said that no one would be made available for comment. The reporter began to draft an

article based on the press release, then read other news stories for background information. Another

newspaper characterized the indictment as alleging that "two Dallas men were to launder bribe money and kickbacks that went to pay corrupt union officials and mobsters."[2]

The *Journal* ran the article on June 20. Appearing on page A10, the article, entitled "Basic Capital Reports It Is Likely To Default On Its Margin Calls," contained the following statement: "Federal authorities allege that the enterprise laundered most of its bribe money through Basic Capital Management."

**June 27**

The reporter wrote another article after receiving a June 26 press release from BCM. In its press release, BCM stated that it was making progress in margin debt restructuring. Appearing on page C8, the article was entitled "American Realty, Basic Capital Reach Agreements On Debt." It summarized the press release and contained a statement that "two men associated with Basic Capital were charged with participating in a moneylaundering scheme with alleged mob ties."

**July 12**

Complaining about the June 20 article, BCM=s general counsel sent a letter on June 29 to the managing editor of the *Journal* asking for a correction. He wrote: "there has been absolutely no allegation made by Federal authorities . . . that Basic Capital or any of its officers, directors or employees ever laundered money for anyone." The *Journal* issued a correction on July 12, stating that "[t]wo of Basic

---

[2] At oral argument, counsel for BCM advised that BCM did not file a lawsuit against the other newspaper.

5

Capital Management=s former advisers who resigned last month were charged with wire fraud and conspiring to pay illegal kickbacks through Basic Capital Management, but were not charged with money laundering.@

**The Lawsuit**

BCM filed suit against Dow Jones for defamation and business disparagement, alleging that the two statements in the June 20 and June 27 articles falsely stated that BCM was involved in money laundering. BCM did not challenge the June 15 article. Dow Jones filed a traditional motion for summary judgment on the grounds that the articles were not libelous because they were true or substantially true, BCM was a public figure for the purposes of the suit, and BCM could not prove actual malice or negligence as a matter of law. The district court granted the motion for summary judgment without specifying the ground and rendered judgment in favor of Dow Jones.

## ANALYSIS

**The standard for reviewing a motion for summary judgment is well established: (i) The movant for summary judgment has the burden of showing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law; (ii) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true; and (iii) every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.** *Nixon v. Mr. Prop. Mgmt. Co.***, 690 S.W.2d 546, 548-49 (Tex. 1985). When a defendant seeks to obtain summary judgment based on a plaintiff=s inability to prove its case, the defendant must conclusively disprove at least one element of each of the plaintiff=s causes of action.** Tex. R. Civ. P. 166a(c); *Huckabee v. Time Warner Entm=t Co.*, 19 S.W.3d 413, 420 (Tex. 2000). Once the movant establishes that it is entitled to summary judgment, the burden shifts to the non-movant to show why summary judgment should not be granted. *See Casso v. Brand*, 776 S.W.2d 551, 556 (Tex. 1989). **Because the trial court=s order does not specify the ground or grounds relied on for its ruling, we will affirm the summary judgment if any of the theories that Dow Jones advanced are meritorious.** *See Carr v. Brasher***, 776 S.W.2d 567, 569 (Tex. 1989).**

BCM alleges in its first issue that Dow Jones did not establish as a matter of law that the statements in the June 20 and June 27 articles were true or substantially true. **BCM further contends that the June 20 statement, that A**Federal authorities allege that the enterprise laundered most of its bribe money through Basic Capital Management,**@ and the June 27 statement, that A**two men associated with Basic Capital were charged with participating in a moneylaundering scheme with alleged mob ties,**@ were

7

neither true nor substantially true, because BCM was not named as a defendant and was not mentioned as a participant in a money-laundering scheme. BCM contends that the false reporting harmed its reputation. Because the parties agree that the challenged statements only characterize the allegations of the indictment, and do not purport to portray the underlying events described therein, our task is necessarily limited to determining whether the articles accurately report the charges set forth in the indictment.

To prevail on a defamation claim, the plaintiff must prove that the defendant published a statement that was defamatory about the plaintiff, while acting with either actual malice—if the plaintiff was a public official or public figure—or negligence—if the plaintiff was a private individual—about the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). A written statement is defamatory if it exposes a person to public contempt or financial injury, or if it impeaches a person=s reputation. *See* Tex. Civ. Prac. & Rem. Code Ann. ' 73.001 (West 1997). To prevail on a business disparagement claim, the plaintiff must prove publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages. *Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 82 (Tex. 2000). **A statement that is true or substantially true cannot support a claim for either defamation or business disparagement.** *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987). **Therefore, if Dow Jones shows the substantial truth of the articles as a matter of law, it will be entitled to summary judgment.** *See McIlvain v. Jacobs,* **794 S.W.2d 14, 15 (Tex. 1990).**

**The substantial truth test stems from the freedom of speech and freedom of press protections of the First Amendment.** *See Masson v. New Yorker Magazine, Inc.*, **501 U.S. 496,**

**516-17 (1991).** Under the substantial truth test, **the truth of the statement in the publication on which an action for libel is based is a defense to the action.** *McIlvain,* **794 S.W.2d at 15;** *see also* Tex. Civ. Prac. & Rem. Code Ann. ' 73.005**. A statement is substantially true, and thus not actionable, if its** A**gist**@ **or** A**sting**@ **is not substantially worse than the literal truth.** *See McIlvain,* **794 S.W.2d at 16;** *Dolcefino v. Randolph,* **19 S.W.3d 906, 921 (Tex. App.**C**Houston [14th Dist.] 2000, pet. denied). This evaluation requires us to determine whether, in the mind of the average person who read the statement, the allegedly defamatory statement was more damaging to the plaintiff**=**s reputation than a truthful statement would have been.** *McIlvain,* **794 S.W.2d at 16;** *Dolcefino***, 19 S.W.3d at 921. When the underlying facts as to the gist of the libelous charge are undisputed, we disregard any variance regarding items of secondary importance and determine substantial truth as a matter of law.** *McIlvain,* **794 S.W.2d at 16.**

**The June 20 Article**

We first examine whether the June 20 article is true or substantially true in stating that the indictment alleges that the racketeering enterprise laundered bribe money through BCM. BCM urges that the statement is false because the indictment does not allege that BCM, Phillips, or Rossi participated in the money-laundering scheme. BCM also argues that the gist of the accusation of money laundering is more damaging to BCM=s reputation in the mind of the average reader of the *Journal* than a truthful statement would have been. We disagree with both contentions.

9

As the substantive racketeering count of the indictment, Count One defines the racketeering enterprise and names twenty-three defendants, including Phillips and Rossi. In addition to describing the money-laundering and kickback schemes engaged in by the enterprise, Count One recites the purposes of the enterprise to include Aconcealing and promoting the enterprise=s unlawful activity by laundering the proceeds of securities fraud and wire fraud.@ While the indictment does not name BCM as a defendant, it also does not suggest that the company played a passive role. According to Count One of the indictment, BCM Aagreed to cause@ the issuance of stock and Afurther agreed with the enterprise@ that for every $10 million in stock issued, it would Acause approximately $2 million of the proceeds to be paid secretly to the enterprise.@

The crime of racketeering includes a pattern of illegal activity that encompasses a wide range of crimes, including, *inter alia*, bribery, money-laundering, extortion, embezzlement, wire and mail fraud, gambling, and murder. *See* 18 U.S.C. ' 1961(1). Here, Count One sets forth a panorama of nineteen racketeering acts that include, *inter alia,* securities fraud, extortion, money-laundering conspiracies, kickback schemes, wire fraud, and witness tampering. While the article could have been more precise in describing BCM=s alleged role, it accurately depicted the allegations of the indictment that the *enterprise* engaged in money laundering and that the bribe moneys, *i.e.*, kickbacks, were obtainedCas it was allegedCthrough the issuance of fraudulent stock by BCM and a second fraudulent investment known as the TradeVentureFund, which was unrelated to BCM. The article was clear that the indictment did not name BCM as a defendant. Moreover, as described in the article, BCM=s role was as consistent with the company being an unwitting conduit as with being a knowing participant.

10

BCM argues that a statement suggesting that BCM was engaged in money laundering would be more damaging to BCM=s reputation because of the opprobrium associated with money laundering as well as the availability of forfeiture as a penalty under the federal crime of money laundering. An ordinary reader of the *Journal*, BCM asserts, could reasonably believe from the article that BCM was at risk for a multimillion-dollar forfeiture.

The taint of the alleged defamatory statement is certainly no greater in the mind of the average reader than a more exacting truthful statement would have been. An ordinary reader could well conclude that the description of BCM as a money-laundering conduit carries less Asting@ than the portions of the indictment that actually mention BCM=s role. In the plain words of the indictment, BCM was alleged to be an active participant in the charged conspiracy.

Moreover, because of the broad availability of forfeiture in RICO[3] cases, BCM was no more exposed to forfeiture for alleged money laundering than it would be for the activities actually alleged in the indictment. RICO provides specifically that a defendant convicted of a violation of the Act Ashall forfeit to the United States . . . any interest the person has acquired or maintained in violation of section 1962 [and] any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.@ 18 U.S.C. ' 1963(1), (3). Courts have held that the statute creates a mandatory obligation of forfeiture after a RICO

---

[3] RICO is an acronym for the Racketeer Influenced and Corrupt Organizations Act. *See, e.g.*, *United States v. Cantu*, 185 F.3d 298, 300 (5th Cir. 2000).

11

conviction. *See, e.g.*, *United States v. Faulkner*, 17 F.3d 745, 774-75 (5th Cir. 1994). Thus, the indictment itself raised the specter of forfeiture of any interests of convicted defendants.

A comparison of the challenged statement and the indictment demonstrates that the article was substantially true and not inaccurate, and that any variance was minor. *See McIlvain*, 794 S.W.2d at 16.

**The June 27 Article**

The June 27 article, as with the June 20 article, arose from a BCM press release. The article reported information from the press release that BCM had avoided threatened margin calls. It also included background information about the indictment. The allegedly defamatory statement, that Atwo men associated with Basic Capital were charged with participating in a moneylaundering scheme with alleged mob ties,@ is true or substantially true. That Phillips and Rossi were associated with BCM was clear from BCM=s own press release that Phillips and Rossi Astepped aside@ from their Aday-to-day responsibilities@ with the company. Phillips was active in the management of the company, and Rossi was director of capital markets for BCM.

Phillips and Rossi were charged in Count One of the indictment as members of the enterprise, which included members of organized crime families. Count One, a forty-seven page description of the racketeering scheme, listed the Ameans and methods of the enterprise,@ including money laundering, union pension fund fraud, and kickback schemes. Additionally, the indictment alleged that Phillips Aagreed . . . to defraud union pension funds@ and that Rossi structured the stock offering and Aagreed that a portion of the proceeds would be used to pay secret bribes.@ The allegations of the indictment thus fall under the

12

ambit of participating in a money laundering scheme, which includes **disguising illegally obtained funds so that the funds appear to come from legitimate sources or activities.** *See* **18 U.S.C. ' 1956.** Money laundering occurs in connection with a wide variety of crimes, including fraud and racketeering. *See id.* Because the gist or sting of the statement characterizing the indictment in the June 27 article is not worse than the literal truth, the statement is substantially true as a matter of law. *See McIlvain*, 794 S.W.2d at 16. We overrule BCM=s first issue.[4]

## CONCLUSION

We conclude that the statements characterizing the indictment in the June 20 and June 27 articles are substantially true as a matter of law. Because Dow Jones has negated an essential element of BCM=s causes of action, we affirm the judgment of the district court granting summary judgment in favor of Dow Jones.

_____

Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices Patterson and Puryear

Affirmed

Filed: October 17, 2002

_____

[4] In light of our disposition of BCM=s first issue, we need not address its remaining issues.

13

Publish