Joan JOHNSON, Kaleta Johnson, Seth Johnson, and Wirt Blaffer, Appellants

v.

Michael PHILLIPS, Spindle Top Publishing, and Phillips Akers Womac, P.C., Appellees

NO. 01-15-00173-CV

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued May 23, 2017

Rehearing Overruled September 7, 2017

Marc S. Tabolsky, YETTER COLE-MAN LLP, Two Houston Center, 909 Fannin, Suite 3600, Houston, Texas 77010, Patrick Zummo, LAW OFFICES OF PATRICK ZUMMO, Two Houston Center, 909 Fannin, Suite 3500, Houston, Texas 77010, for Appellants.

William W. Ogden, Judith A. Meyer, OGDEN, GIBSON, BROOCKS, LONGO-RIA & HALL, L.L.P., 1900 Pennzoil South Tower, Houston, Texas 77002, for Appellees.

Panel consists of Justices Jennings, Massengale, and Huddle.

## OPINION

Rebeca Huddle, Justice

After siblings Kaleta and Seth Johnson sued Dinesh Shah for Shah's protracted abuse of their family, Michael Phillips, a Houston attorney, defended Shah against the allegations in a 2008 civil trial. Phillips later published a book, titled "Monster in River Oaks," about the events giving rise to the suit. According to its prologue, the book tells the "story of a predatory monster that set out to control and then dominate a famous Houston family," the Johnsons. Kaleta and Seth, along with their mother, Joan Johnson, and their brother, Wirt Blaffer, sued Phillips, his law firm, and the book's publisher, alleging that the book libeled them.

The defendants moved for traditional and no-evidence summary judgment, arguing that the book constituted a fair report of the 2008 trial and that neither the book as a whole nor any of the complained-of passages was defamatory. The trial court granted summary judgment without specifying its reasons, and the family appealed, arguing that the book is defamatory and not protected by the fair report privilege. We hold that the book as a whole and the complained-of passages are not defamatory as a matter of law, and, accordingly, we affirm the trial court's summary judgment.

## Background

### The 2008 trial

The gravamen of Kaleta and Seth's suit against Shah was that he and his friend David Collie systematically isolated the family and moved into their River Oaks home, where they abused them and siphoned millions of dollars for Shah's use.[1] In particular, Kaleta and Seth alleged that Shah coerced Joan to send their oldest sibling, 16-year-old Wirt, away to school to clear the path for Shah to inflict physical and mental abuse on Joan, Seth, and Kaleta, and, most horrifically, to sexually abuse the youngest sibling, Seth. While Collie eventually left the family home voluntarily, Shah's reign spanned years, until he was forcibly removed by police, arrested and charged with injury to a child for striking Kaleta.

Kaleta and Seth asserted claims for assault, intentional infliction of emotional distress, breach of fiduciary duty, and conspiracy. Phillips represented Shah during the two-week jury trial, after which the

---

1. Collie settled before trial.

jury returned a $20 million verdict in Kaleta and Seth's favor.

### The book

Two years after the trial, Phillips self-published "Monster in River Oaks." The book relates the history of the family beginning with R.L. Blaffer, a founder of Exxon and great-grandfather of the siblings. It describes Joan's marriage to Luke Johnson, the siblings' father, and Luke's sudden death in 1995. It goes on to describe how Joan, a widow with three young children, met Shah and Collie soon after Luke's death. It details how Shah and Collie befriended Joan, pretended to have expertise managing investments, and began to help Joan manage her finances.

The book relates that Joan and Collie were romantically involved for a time, but the romantic aspect of the dynamic is not the book's focus. Instead, the book devotes itself primarily to describing in significant detail Shah's escalating physical and psychological control over every aspect of the family's life—he dictated the family's financial, social and educational affairs for years—until he was finally arrested and forcibly removed from the home in 2002. The epilogue then informs the reader that Phillips, the book's author, was Shah's lawyer in the 2008 trial, and that he felt moved to write the book so that others would learn from the "sordid tale."

### The underlying case

In 2011, the family sued Phillips, his law firm, and his publisher, for libel. The defendants moved for summary judgment, arguing in their traditional motion that the book was protected by the statutory, common law, and constitutional fair-report privileges because it is a fair report of the 2008 trial. They also argued that the book and the complained-of passages were not defamatory because they presented a fair and true account of the trial and the evidence and argument adduced therein, and Phillips's characterizations of the trial evidence were not actionable because they are opinions, not objectively verifiable statements. In the no-evidence motion, the defendants similarly contended that there was no evidence that any of the complained-of statements or gists of the book (1) had a defamatory meaning, (2) were objectively verifiable as opposed to opinion or unverifiable characterizations; or (3) were substantially false.

The family responded, arguing that the fair-report privilege did not apply and identifying passages they contended were not fair or accurate reports of the trial or opinions and were defamatory. The trial court granted Phillips summary judgment on all claims without specifying its reasons. The family appealed.[2]

### Discussion

In their sole issue on appeal, the family argues that the trial court erred in granting summary judgment. Specifically, they argue that the book is not protected by the fair-report privilege and that, at a minimum, there are fact issues regarding whether the book as a whole or the complained-of passages are defamatory. We first address whether the book as a whole or the complained-of passages are defamatory because this issue is dispositive.

---

2. The trial court's summary judgment disposed of all of the family's claims, including various tort claims other than libel. Although the family's briefing states that the family challenges the summary judgment in its entirety, it does not address why rendition of summary judgment as to the claims other than libel was erroneous. Accordingly, the family's challenge to the summary judgment as to all claims other than libel is waived. See Tex. R. App. P. 38.1(i).

## A. Standard of Review

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any of the grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

To prevail on a no-evidence motion for summary judgment, the movant must establish that there is no evidence to support an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See* Tex. R. Civ. P. 166a(i); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to each of the elements specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Hahn*, 321 S.W.3d at 524.

In a traditional summary judgment motion, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. Tex. R. Civ. P. 166a(c); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999).

## B. Applicable Law

Generally, to prevail on a cause of action for libel, a plaintiff who is a private individual must prove that the defendant (1) published a statement (2) that was defamatory concerning the plaintiff (3) while acting with malice, if the defendant is a media defendant, or while acting with negligence, if the defendant is not a media defendant. *Klentzman v. Brady*, 312 S.W.3d 886, 897 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)).

Whether a statement is reasonably capable of defamatory meaning is a question of law for the court. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987); *Schauer v. Mem'l Care Sys.*, 856 S.W.2d 437, 446 (Tex. App.—Houston [1st Dist.] 1993, no pet.), *disapproved on other grounds by Huckabee v. Time Warner Entmt. Co.*, 19 S.W.3d 413 (Tex. 2000). If a statement is not reasonably capable of a defamatory meaning, the statement is not defamatory as a matter of law, and the claim fails. *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013).

A statement is defamatory if it tends to injure the subject's reputation, to expose him to public hatred, contempt, ridicule, or financial injury, or to impeach his honesty, integrity, or virtue. *Blanche v. First Nationwide Mortg. Corp.*, 74 S.W.3d 444, 456 (Tex. App.—Dallas 2002, no pet.). Whether a publication is false and defamatory depends upon a reasonable person's perception of the entire publication. *Turner*, 38 S.W.3d at 115 (defamation determined by looking at entire communication); *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) ("[P]ublications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the sources itself."); *Schauer*, 856 S.W.2d at 446 ("To

determine if a publication is defamatory, the court must look at the entire communication and not examine separate sentences or portions.").

█ The reasonable person is someone of "ordinary intelligence"—"a prototype of a person who exercises care and prudence, but not omniscience." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 154, 157 (Tex. 2004) (question is how hypothetical "reasonable reader"—someone of "ordinary intelligence"—would understand statement). This person is "no dullard" and represents "reasonable intelligence and learning," not the "lowest common denominator." *Id.* at 157.

█ Opinions are not defamatory. *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013); *see also Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989) ("[A]ll assertions of opinion are protected by the [F]irst [A]mendment. . . ."). Thus, to be actionable, a statement must assert an objectively verifiable fact rather than an opinion. *Neely*, 418 S.W.3d at 62. We classify a statement as fact or opinion based on the statement's verifiability and the entire context in which the statement was made. *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002). Whether a statement is a statement of fact or opinion is a question of law to be decided by the court. *See id.*; *Robertson v. Sw. Bell Yellow Pages, Inc.*, 190 S.W.3d 899, 903 (Tex. App.—Dallas 2006, no pet.).

█ A statement may be false, abusive, unpleasant, or objectionable without injuring a person's reputation such that it is defamatory. *See Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 854 (Tex. App.—Dallas 2003, no pet.); *Schauer*, 856 S.W.2d at 446. Moreover, if "[t]he taint of the alleged defamatory statement is . . . no

greater in the mind of the average reader than a more exacting truthful statement would have been," it is not defamatory. *Basic Capital Mgmt., Inc. v. Dow Jones & Co.*, 96 S.W.3d 475, 482 (Tex. App.—Austin 2002, no pet.). In other words, if the truth about the person would injure their reputation just as much as the allegedly defamatory statement, then the statement is not defamatory. *See id.* Only if the court determines the language is ambiguous should the jury decide the statement's meaning and the effect of the statement's publication on an ordinary reader. *Schauer*, 856 S.W.2d at 446; *Einhorn v. LaChance*, 823 S.W.2d 405, 411 (Tex. App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.).

█ Whether or not a particular plaintiff is required to prove the falsity of the challenged statement, a defendant may assert truth as an affirmative defense to a libel action. Tex. Civ. Prac. & Rem. Code § 73.005; *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). The truth of a statement is an absolute defense to a claim for defamation. *See Klentzman*, 312 S.W.3d at 898. A true account is not actionable—regardless of the conclusions that people may draw—so long as it does not create a substantially false and defamatory impression by omitting material facts or suggestively juxtaposing them in a misleading way. *Turner*, 38 S.W.3d at 115, 118.

### C. The book as a whole, and the gists and passages, are not defamatory.

In the trial court, the family complained that the book as a whole, and 91 of its passages, which they categorized into 8 "gists," were defamatory.[3] On appeal, the family contends that they raised a fact issue regarding whether the book as a

---

3. These passages and gists were identified in a stipulation, and both sides adopted this numbering system in the summary-judgment briefing.

whole is defamatory. They also contend that they raised fact issues regarding the defamatory nature of 58 of the passages, all of which fall into 5 gists: [4]

- 19 passages the family contends are defamatory because their gist is that the family was violent;
- 8 passages the family contends are defamatory because their gist is that the family members are dishonest and perjured themselves in the 2008 trial;
- 5 passages the family contends are defamatory because their gist is that Joan and Wirt abused drugs and alcohol;
- 7 passages the family contends are defamatory because their gist is that Joan was a neglectful parent; and
- 19 passages the family contends are defamatory because their gist is that Joan knowingly permitted Shah and Collie to abuse her children.

We conclude that the defendants met their burden to demonstrate that the book as a whole and the complained-of passages are not defamatory as a matter of law.

### 1. The book as a whole

In determining whether the book as a whole is defamatory, we consider how a reasonable person would perceive the entire publication. *See Turner*, 38 S.W.3d at 115; *Schauer*, 856 S.W.2d at 446. The book's title and prologue characterize Shah as a "monster." Throughout the book Shah is described as a "habitual liar," a "manipulator," and "physically violent." The book tells the reader that Shah "perjured himself" at the 2008 trial and was "exposed" as a "liar." Shah stole, manipulated, and inflicted psychological and physical abuse on a widow and her children. He is undeniably painted as the villain.

By contrast, the book describes Kaleta and Seth's trial testimony as something about which their great-grandfather would be "proud." It observes that they were "impressive" and "powerful" witnesses, and that their compelling testimony when contrasted with Shah's lies was "damning." A reasonable reader would perceive the family, unlike Shah, as victims vindicated by the jury. In short, while the book reveals unpleasant details about the family's victimization, it is not defamatory because, viewed as a whole, the book paints them as honest and virtuous. *See Blanche*, 74 S.W.3d at 456 (defamatory statement is one that tends to injure the subject's reputation, to expose him to public hatred, contempt, ridicule, or financial injury, or to impeach his honesty, integrity, or virtue).

There are some exceptions, and the family correctly points out that some passages cast the family in an unfavorable light. But those passages generally attribute the unflattering claim about the family to Shah— i.e, they communicate that Shah made the unflattering assertion about the family during his trial testimony—and, in that sense, they are true and therefore not defamatory. *See Turner*, 38 S.W.3d at 115, 118 (true account is not actionable so long as it does not create a substantially false and defamatory impression by omitting facts or juxtaposing them in a misleading way); *Klentzman*, 312 S.W.3d at 898 (truth is an absolute defense to defamation). Ultimately, the book communicates to the reader that the family's accusations of abuse by Shah were true and were believed by the jury, which returned an extraordinary verdict against Shah.

The family contends that the book is defamatory because it goes beyond merely recounting the trial evidence and includes

---

4. By failing to raise complaints about the other 33 passages on appeal, appellants abandoned any libel claim based on those passages. *See* Tex. R. App. P. 38.1(i).

Phillips's commentary on the evidence, some of which criticizes the family, without expressly disclosing that he is presenting his personal viewpoint or flourish. But the book discloses that it was written by Phillips and that he was Shah's defense lawyer at the 2008 trial. Federal courts considering similar cases have concluded the First Amendment protects an author's analysis, insight, and gloss on such events, because a reasonable reader is able to make his own judgments about the evidence and would expect participants in the trial to have particular viewpoints.

In *Riley v. Harr*, 292 F.3d 282 (1st Cir. 2002), a former environmental contamination defendant sued the author of a book about the trial and surrounding events. *Id.* at 286. The book told the story primarily from the perspective of the lawyer who had represented the plaintiffs, and sharply criticized the defendant. *Id.* The First Circuit concluded that the book was not defamatory because a reader could draw his own conclusions based on the fact that the book related the perspective of a lawyer who was a participant in the case and the author's own opinions regarding the case. *See id.* at 290 (question is whether book signals to readers "that only one conclusion was possible" regarding trial evidence or whether "readers implicitly were invited to draw their own conclusions from the mixed information provided").

Likewise, in *Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995), appointed counsel, who represented a murder defendant, sued another lawyer, whose client was acquitted of the same murder, for defamation after the second lawyer wrote a book that was critical of the first lawyer. *Id.* at 1149. The Ninth Circuit concluded that the book was not defamatory because a reasonable reader would expect a book by a participating lawyer to "offer the personal viewpoint of the author concerning the tri-

al[ ]." *Id.* at 1153 (reader would expect book about trial by participating trial lawyer to convey author's personal viewpoint). Thus, a book written by a participating lawyer, like Phillips's book, is "a forum in which a reader would be likely to recognize that the critiques of ... witnesses[ ] and other participants ... generally represent the highly subjective opinions of the author rather than assertions of verifiable, objective facts." *Id.* at 1154 ("When, as here, an author writing about a controversial occurrence fairly describes the general events involved and offers his personal perspective about some of its ambiguities and disputed facts, his statements should generally be protected by the First Amendment.").

Phillips was therefore not required "to provide only dry, colorless descriptions of facts, bereft of analysis or insight" to avoid a claim of defamation. *Id.* at 1154, 1157 ("[T]he First Amendment protects the 'rhetorical hyperbole' and 'imaginative expression' that enlivens writers' prose."; "Otherwise, there would be no room for expressions of opinion by commentators, experts in a field, figures closely involved in a public controversy, or others whose perspectives might be of interest to the public."); *see also Riley*, 292 F.3d at 291–99 (statements in book that defendant had lied and "committed perjury," covered up use of toxic chemicals, created and concealed "toxic waste dump," and that attorney's colleague told him defendant "killed your kids," were protected by First Amendment and not actionable as defamation). Otherwise, "[t]here would be little difference between the editorial page and the front page, [or] between commentary and reporting...." *Partington*, 56 F.3d at 1154. In other words, the First Amendment protects Phillips's right to share his perspective on the trial and related events.

Nevertheless, the family contends that the book's dust jacket and prologue prove that a reasonable reader would not understand the book as a whole to provide Phillips's personal perspective about the trial witnesses and evidence. They contend it reflects the dramatic flair of a daytime soap opera. The dust-jacket states, in part:

> Not since *Blood and Money* have such secrets of passion and possession been revealed about the residents of Houston's River Oaks neighborhood, home to some of the nation's most elite, powerful and wealthy families.
>
> . . . .
>
> An intriguing story for the student of human weaknesses and the reader who relishes insights into forbidden secrets of the fabulously rich.

The book's prologue tells the reader:

> In certain Houston circles, love is eternal as long as it lasts. In some ways, this book is a love story as well as a monster story. A story of a predatory monster that set out to control and then dominate a famous Houston family, a family whose grandfather founded a company that would become Exxon. It is a story of child abuse, pedophilia, squandered fortunes, covered-up homosexual affairs, generous charitable donations, misguided parents, and desperate children. It is a story of love offered but not returned. Of love needed but not offered. The story is based on police files, private investigator reports and trial evidence, but that is not the significant point. What happened for six years at 2933 Del Monte Drive could not have happened just anywhere in America. It could happen only in River Oaks.

But the question of whether the book is defamatory cannot be reduced to what a reader might conclude based solely on the dust jacket and prologue. *Schauer*, 856 S.W.2d at 446 ("To determine if a publication is defamatory, the court must look at the entire communication and not examine separate sentences or portions."); *see also Turner*, 38 S.W.3d at 115. We instead consider the entire book, which explains that Phillips was Shah's defense lawyer and that he decided to write the book because he felt compelled to share his thoughts about the events surrounding the 2008 trial.

The family also contends that the republication of the trial testimony or defensive arguments advanced at trial constitutes defamation because the testimony and arguments were defamatory when they were uttered at trial. But a defendant cannot be liable for presenting a true account of events, particularly an account of a trial in which communications are judicially privileged, regardless of what someone may infer from the account. *See Turner*, 38 S.W.3d at 115; *see also James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982) (communications made in judicial proceeding are absolutely privileged and will not serve as basis for libel action, even if made with malice). Likewise, a defendant cannot be liable for presenting his opinions about an event like a trial. *See Neely*, 418 S.W.3d at 62 (to be actionable, statement must be objectively verifiable fact, not opinion).

In short, the book is an account of sharply conflicting, inflammatory, and accusatory trial evidence and argument, peppered with the lawyer-author's opinions about the trial, which ended with the family being vindicated. A reasonable person considering the book as a whole would not perceive it to impugn the family's character, and the book fairly attributes negative assertions about the family to Shah's trial testimony and adequately informs the reader of conflicts in the testimony, thus insulating those assertions from the family's defamation claim. And, finally, Phillips's editorial flourish on the trial testimo-

ny is opinion protected by the First Amendment. For all of these reasons, we hold that the trial court did not err in granting summary judgment on the family's libel-as-a-whole claim. *See Turner*, 38 S.W.3d at 114 (whether statement is reasonably capable of defamatory meaning is question of law for court); *Schauer*, 856 S.W.2d at 446 (same); *see also Partington*, 56 F.3d at 1153 (lawyer's book about trial in which he was participant was not defamatory); *Riley*, 292 F.3d at 290 (book relating story of trial and surrounding events from plaintiff's lawyer's perspective was not defamatory); *see, e.g., Liles v. Finstad*, No. 01-94-00258-CV, 1995 WL 457260, at *14 (Tex. App.—Houston [1st Dist.] Aug. 3, 1995, writ denied) (not designated for publication) (affirming summary judgment on defamation claim based on book regarding attempted murder investigation because statements about plaintiff police officer in book were substantially true or not reasonably capable of defamatory meaning).

### 2. Gists and passages

In determining whether any of the gists or complained-of passages are defamatory, we are mindful that we must consider each gist and passage in the context of the book as a whole, not in a vacuum. *See Turner*, 38 S.W.3d at 115; *Schauer*, 856 S.W.2d at 446. We note at the outset that each of the book's complained-of gists and passages has a basis in the evidence or argument presented at the 2008 trial. In the context of the book as a whole, it is apparent that the five gists into which the complained-of passages fall were five themes that Phillips attempted to develop in mounting Shah's defense. The family argues, however, that the passages do not adequately inform the reader that they are conveying disputed evidence or Phillips's opinion of the evidence.

We conclude that none of the complained-of passages or gists, when viewed in the context of the book as a whole, is capable of defamatory meaning because they expressly relate specific trial evidence or argument, relate evidence that the reasonable reader would know was disputed at trial, or relate Phillips's subjective opinions about the witnesses, evidence, or arguments raised at trial.

#### a. Family violence gist

The family points to 19 passages (passages 1–19) which, they argue, convey the gist that the family was violent, frequently fighting and physically injuring each other. But nearly all of these passages expressly convey that they are relating conflicting trial evidence, or would be understood by the reasonable reader to be relating Phillips's opinion regarding the evidence. Passage 2 is an example of a passage that is not defamatory because, although it portrays Kaleta as violent, it makes clear that it is based on statements made at trial and is thus true:

[D]uring the civil suit, Kaleta told the court about those fights with her brother, admitting that they did, on occasion, get out of hand. In her 2008 testimony, Kaleta recalled a particularly nasty fight with Seth that ended in a trip to the emergency room. The two were riding in the backseat of the car and, Kaleta recalled, Seth was teasing her. Unable to control her anger, Kaleta threw her small flashlight keychain at her brother, hitting him directly above the eye. Seth's forehead split open, gushing blood. Joan immediately turned the car around and took him to the emergency room, where Seth received eleven stitches. Dinny, who was in the car with them during that fight, tells a similar story, with one notable exception: According to his testimony, Seth did end up in the ER that night. But in Dinny's

version, the damage was done by something larger than a keychain. It was a baseball bat, swung by Kaleta.

Likewise, the family complains that passage 14 defamed the family by telling the reader "the children suffered from neglect and physical abuse." But the paragraph in the book from which this statement is excerpted tells the reader that this was Shah's testimony:

> Dinny's further testimony painted an increasingly bleak picture.... Joan, he claimed, was battling alcoholism, and the children suffered from neglect and physical abuse.

Thus, in context, it is clear to the reader that this was merely one of the discredited claims Shah uttered at trial. Because the book accurately relates that Shah made the statement at trial, the passage is true and not defamatory. *See Turner*, 38 S.W.3d at 115, 118 (true account is not actionable so long as it does not create a substantially false and defamatory impression by omitting facts or juxtaposing them in a misleading way); *Klentzman*, 312 S.W.3d at 898 (truth is an absolute defense to defamation).

Shah also claimed at trial that Wirt was violent. In passage 12, Phillips notes that Joan wrote her lawyers to tell them that Wirt was causing "problems," and Phillips remarks that Wirt had "obviously been a violent and disrespectful teenager." But elsewhere, the book explains that the evidence supporting Shah's claim that Wirt was violent were documents authored by Joan that, according to the family, Shah coerced her to sign. A reasonable reader would know that the statement that Wirt was "obviously ... violent and disrespectful" was Phillips's opinion of the relative weight of disputed evidence, on which he would have had a particular perspective as a participant at trial. *See Riley*, 292 F.3d at 290 (question is whether book signals to readers "that only one conclusion was possible" regarding trial evidence or whether "readers implicitly were invited to draw their own conclusions from the mixed information provided").

Two other passages the family relies on describe Phillips's attempts to get Kaleta and Seth to concede that Joan physically abused them. Phillips recounts his in-courtroom questioning of Kaleta and Seth about a memo titled "Things for Mom to Work On." One item in the memo reads: "no violence/kicking." The family argues that this passage gives the reader the false impression that Joan was violent and kicked her children. But the book also cites evidence that undercuts the assertion that Joan was violent: Kaleta and Seth denied being physically abused by Joan, could not recall writing the memo, and testified that if they did write it, it was likely coerced by Shah. In short, the book repeatedly informs the reader that Kaleta and Seth denied that Joan physically abused them, and a reasonable reader would understand that the account that posits Joan as an abusive parent is but one of two competing accounts. *See id.* Because the book presents mixed information from which readers were invited to draw their own conclusions, Phillips's own opinions about the relative merit of the evidence is not actionable as defamation. *See id.*; *Neely*, 418 S.W.3d at 62.

Accordingly, we conclude that the family violence gist and passages 1 through 19, when considered in the context of the book as a whole, are not reasonably capable of defamatory meaning.

#### b. Perjury and dishonesty gist

The family next complains about 8 passages (passages 20–27), the gist of which, they argue, is that the family members are dishonest and perjured themselves at trial. One of these, passage 27, is

excerpted by the family as "Joan was teaching Seth to lie and steal." But considering this passage in its context makes clear that the book is recounting Collie's trial testimony:

> Attorney: The relationship, the romance, cooled at some point after six months. Is that fair to say?
>
> Collie: I can't remember when it cooled. It cooled after the Seth incident with the Game Boy when Joan was teaching Seth to lie and steal.

Because the book merely relates an assertion made at trial, it is not defamatory. *See Turner*, 38 S.W.3d at 115, 118 (true account is not actionable). Likewise, passage 24 states that Shah argued at trial that the accusations against him were "exaggerated ... in order to deflect jury attention from Joan's failure to blow the whistle, to resort to the legions of lawyers who looked after her millions, to respond to helpful neighbors." It is not defamatory because it accurately describes Shah's blame-the-victim trial strategy. *Id.*

Three other passages (passage 23, 25, and 26), in context, cast the family in a positive light or would not be understood to be defamatory by a reasonable reader. For example, passage 25, which the family complains defames Wirt as being "manipulative" and dishonest, states:

> Why was Joan so dismissive about Wirt's accusations regarding sexual misconduct between David and Seth? Was it because she believed Wirt was making up stories? Perhaps this was the jealous invention of a cunning sixteen-year-old who wanted David and Dinny out of the Johnsons' lives. Like any teenager, Wirt could be manipulative; it also goes without saying that he probably resented the men's new role as disciplinarians in the Johnson household.

To begin, the passage states that Wirt's ability to manipulate was equal to that of any teenager. It does not paint Wirt in a less favorable light than the average teenager. In any event, in context, the rhetorical questions make clear to the reader that the author is offering speculative opinions about why Joan reacted as she did to a difficult, grave piece of information. The hypotheses are not the kind of verifiable statements of fact needed to support a defamation claim. *Neely*, 418 S.W.3d at 62 (opinions are not defamatory).

The family complains that in the remaining three passages related to the "perjury and dishonesty" gist, Phillips expressly questions the veracity of their trial testimony. But, as discussed above, a reasonable reader would not be surprised that Phillips criticized testimony from the other side's witnesses as incredible, and could weigh Phillips's opinion in this light. Thus, passages in which Phillips states that, for example, Kaleta's testimony "begged credulity" (passage 20), or defense counsel "went in circles" with Kaleta and Seth regarding whether Joan hit them and their refusal to accede to this questioning was "frustrating" (passages 21 and 22), are not capable of defamatory meaning. *See Riley*, 292 F.3d at 291–93 (statements expressing belief that defendant had not given truthful testimony was opinion protected under First Amendment and not defamatory as a matter of law).

Accordingly, we conclude that passages 20 through 27 are not reasonably capable of defamatory meaning.·

#### c. Drug and alcohol abuse gist

██ The family complains about five passages (passages 28–32) they contend are defamatory because the gist of these passages is that Joan and Wirt abused drugs and alcohol.

Passage 28 describes Shah's testimony in which he claimed that Wirt drank and

took drugs. The book conveys that one of the defensive strategies at trial was to make Shah sympathetic by claiming that he had helped Joan deal with Wirt's alleged misbehavior. Accordingly, reasonable readers could determine for themselves whether Shah's version of these events was believable given that he was a "habitual liar" and had an incentive to make himself appear more sympathetic.

The remaining four passages pertain to Shah's claim at trial that Joan was an alcoholic. But the book makes clear that there was virtually no evidence supporting this claim other than Shah's say-so. Passage 31 states:

> Dinny's accusations [about Joan] make sense, in context: After all, Joan was a borderline alcohol abuser according to Dinny, although there is not much direct evidence to support that. She dropped in and out of Alcoholics Anonymous sessions, though she often drank at charity events and social gatherings with Houston's uber wealthy families.

Passages 29 and 30 likewise describe or directly quote portions of the 2008 trial testimony related to Shah's claim that Joan was an alcoholic and her denial of that claim. *See Turner*, 38 S.W.3d at 115, 118. The reader is free to believe or disbelieve Shah's unsupported claim. And passage 32 contains Phillips's speculation about whether alcoholism might have motivated Collie to end his romantic relationship with Joan—a hypothesis a reasonable reader was free to credit or discredit in light of the entire book and the fact that the person who claimed Joan was an alcoholic was a predator and a discredited, habitual liar. *See Neely*, 418 S.W.3d at 62 (to be actionable, statement must be objectively verifiable fact, not opinion).

Accordingly, we conclude that the perjury and dishonesty gist and passages 28 through 32 are not reasonably capable of defamatory meaning.

#### d. Parental neglect gist

The family complains that seven passages (passages 33–39) are defamatory because their gist is that Joan was a neglectful parent. But, as with the other gists, the majority of these passages (passages 33–38) merely relate assertions that Shah and Collie made at trial about Joan's parenting. They are therefore true, and fairly presented as one side's account of events so as to permit the reader to make his own judgments about their veracity. *See Turner*, 38 S.W.3d at 115, 118. In the final passage, 39, Phillips asks, "Was Joan Johnson really the neglectful, uncaring mother that Dinny claimed she was?"— expressly inviting the reader to question whether Shah was a credible witness. In short, the passages in this gist fairly present competing theories and testimony, permitting the reader to draw his own conclusions. Accordingly, we conclude that passages 33 through 39 are not reasonably capable of defamatory meaning. *See Riley*, 292 F.3d at 290 (statements are not defamatory if in context of book readers are implicitly invited to draw their own conclusions from mixed information).

#### e. Child abuse gist

The final gist about which the family complains is that Joan knowingly permitted Shah and Collie to abuse her children. Eleven of these passages (passages 46–49, 51–55, 60–61), while critical of Joan, are not defamatory as a matter of law because they accurately characterize the trial evidence and present Phillips's opinions or speculation regarding that evidence. For example, passages 48 and 49 refer to documentary evidence admitted at trial that showed that Joan executed legal documents giving Shah and Collie total

control over her financial affairs and powers of attorney over her and her children:

> Tragically, Joan even voluntarily signed over guardianship of Seth to Dinny—not once, but twice..... Inexplicably, Joan was handing over her son's welfare to a man she hardly knew.

> ....

> Moreover, David and Dinny literally held the power to make life-and-death decisions for both Joan and her youngest children. Such seemingly ill-advised legal moves concerning two men that weren't family—two men she'd known for just two years—makes even the most casual outside observer wonder: What was Joan Johnson thinking?

> ....

> Truth is, Dinny had no real qualifications to work in the financial sector.... In the 2008 civil trial, Dinny openly admitted that he had never received any type of degree in business administration or finance and that he wasn't a qualified or licensed CPA or investment banker.

> In fact, it seems the only official license Dinny held back in 1998 was a Texas driver's license. But either Joan didn't care or she never took the time to find out for herself.

Similarly, passage 51 tells the reader:

> As bad situations often go, [in 1998,] Joan Johnson's was about to get worse. She had failed to protect her children from Dinny and David's heavy-handed punishments. She had failed to protect herself and her family from the slow isolation that Dinny and David had orchestrated. She had failed to reach out to her friends and neighbors for help.

Though unflattering, these passages are not defamatory because they are grounded in the evidence presented at trial and present mere opinion. *See Double Diamond,* 109 S.W.3d at 854 (unflattering opinions or observations are not actionable defamation). In particular, Phillips's opinions that Joan's actions were "tragic," "inexplicable," or "ill-advised" (passages 48 and 49) or his questions, like "Why did Joan wait over four years before taking legal action on behalf of the children?" and "Was Joan ... really a battered, terrified woman ...?" (passage 61), do not constitute objectively verifiable facts that are actionable. *See Neely,* 418 S.W.3d at 62 (to be actionable, statement must be objectively verifiable fact, not opinion).

One of the passages in this gist, passage 50, which the family identified at oral argument as particularly defamatory, is not defamatory because it would not create any more opprobrium in the mind of a reasonable reader than things the family acknowledges to be true. According to the family, passage 50 defames Joan by describing an incident in which she did nothing when Shah struck Seth:

> ... Dinny took Seth by the arm and led him into his room and beat him for disobeying. Joan, this time fully aware of what was happening, did nothing. The outrageous was rapidly becoming the norm.

But the family does not dispute that Joan was aware that Shah repeatedly struck her children, or that she failed to remove them from the situation. Indeed, Joan testified about a time that she heard Shah beating Seth and did nothing, and the book conveys that the family presented a psychological expert to explain that Joan's crippling fear of Shah made her unable to protect her children from Shah's abuse. The average reader would not consider passage 50 to "taint" Joan any more than the things that the family acknowledged occurred, and therefore it is not defamatory. *See Basic Capital Mgmt.,* 96 S.W.3d at 482 (if "taint of the alleged defamatory

statement is ... no greater in the mind of the average reader than a more exacting truthful statement would have been," it is not defamatory); *see also Turner*, 38 S.W.3d at 115, 118.

Six of the complained-of passages in this gist, 56–59, 62 and 63, pertain to a defensive theory advanced at the trial—that Joan overlooked Shah and Collie's abuse of her children in an attempt to blackmail or convince Collie to marry her because of her desire for the social standing that marriage to Collie would bring. For example, passage 57, in part, observes that Joan's "desire for David seemingly overshadowed her responsibilities as a mother." But a reasonable reader would understand that these passages relate Phillips's opinions and speculation about this issue · and are merely one view—his own—of the merits of this defensive theory. *See Partington*, 56 F.3d at 1153–54; *Neely*, 418 S.W.3d at 62. · Phillips's speculation regarding this theory is not an objectively verifiable assertion, and a person of ordinary intelligence would understand that Phillips would have a particular perspective on this theory. *See Partington*, 56 F.3d at 1153 ("trial lawyers[ ] are not known for their modesty," so reasonable reader of a book by lawyer recounting trial in which he participated "would generally expect such authors to have a higher opinion of their own performance" and the theories they advanced at trial).

In passage 64, Phillips describes Shah's prosecution for his injury to a child offense and interposes opinions about that proceeding. He expresses his opinion that Shah should have been more aggressively charged and prosecuted given the evidence at the 2008 trial, and asserts that the fact that Shah received deferred adjudication should "horrify the public." He questions whether Joan "could have pressed the DA harder to force ... a jury trial" and sug-

gests that the fact that the family later brought a civil suit suggests that Joan "wanted money for the crime, not time behind bars." While these opinions may be unpleasant or objectionable, they do not constitute defamation because they are mere opinions, not verifiable facts. *See Neely*, 418 S.W.3d at 62; *Double Diamond*, 109 S.W.3d at 854.

Accordingly, we conclude that the child abuse gist and passages 46 through 64 are not reasonably capable of defamatory meaning. *See Hancock*, 400 S.W.3d at 66 (if statement is not reasonably capable of defamatory meaning, statement is not defamatory as a matter of law, and defamation claim fails).

### Conclusion

Because the book as a whole and each of the complained-of gists and passages are not defamatory as a matter of law, we hold that the trial court did not err in granting summary judgment on the family's libel claim.

We affirm the trial court's judgment.