Opinion issued December 29, 2020



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-20-00216-CV

————————————

**CHOCTAW CONSTRUCTION SERVICES LLC, Appellant**

**V.**

**RAIL-LIFE RAILROAD SERVICES, LLC; DAVID PINA TORRES; ESEQUIEL OLMEDA, Appellees**

On Appeal from the 240th District Court
Fort Bend County, Texas
Trial Court Case No. 19-DCV-268460

## O P I N I O N

Rail-Life Railroad Services, LLC sued Choctaw Construction Services, LLC for tortious interference with contract, business disparagement, and other claims arising out of allegedly false allegations by Choctaw. Choctaw sought dismissal of

the suit under the Texas Citizens Participation Act ("TCPA").[1] The trial court denied Choctaw's motion to dismiss. On appeal, Choctaw challenges the trial court's order denying its TCPA motion. We reverse and remand.

## Background

Choctaw is a construction company specializing in railroad construction, railroad maintenance, railroad emergency services, soil excavation, and underground utilities. In June 2017, Choctaw hired Esequiel Olmeda as a supervisor. The year after, Choctaw hired David Pina Torres as a general foreperson. Olmeda and Torres collectively had over two decades of experience in railroad maintenance and construction. Their duties included providing services to Choctaw's clients, including Union Pacific Corporation.

Around July 2019, while still working for Choctaw, Olmeda and Torres formed Rail-Life to "become a direct supplier/vendor/contractor for Union Pacific." Choctaw later terminated Olmeda and Torres upon learning about their rival business. Union Pacific required every contractor to retrieve eRailsafe badges from terminated employees. An eRailsafe badge is an identification card that Union Pacific developed to comply with the Department of Homeland Security's

---

[1]     TEX. CIV. PRAC. & REM. CODE §§ 27.001–.011. The Texas Legislature amended the TCPA in its most recent legislative session and the amendments are effective September 1, 2019. Because this suit was filed after the effective date of the amendments, all citations to the TCPA in this opinion are to the amended statute.

requirements issued in the wake of the September 11, 2001 terrorist attacks. *See* 6 U.S.C. § 1161–1172 (addressing railroad security recommendations). Union Pacific required every person entering its property to show an eRailsafe badge identifying the person's name and employer.

After Choctaw fired Olmeda and Torres, their company, Rail-Life, sued Choctaw for tortious interference with prospective business relations and existing contracts, business disparagement, defamation, and unfair competition. Rail-Life alleged that Choctaw had falsely accused Rail-Life's employees of using Choctaw-issued eRailsafe badges to gain access to Union Pacific's worksite. Rail-Life also alleged that C. Baker, a general manager at Choctaw, reported Rail-Life's misuse of Choctaw badges to "Union Pacific's RailRoad Police." Union Pacific investigated these allegations. During the investigation, Union Pacific temporarily prohibited Rail-Life from working on any of its existing projects. Union Pacific also did not invite Rail-Life to bid on any new projects during this time. Rail-Life denied the allegations that it had taken and misused Choctaw's badges.

Along with the accusations of misusing badges, Rail-Life alleged that Choctaw had falsely accused Rail-Life of stealing fuel and equipment from Choctaw. It claimed that Choctaw general manager Baker told Union Pacific that Rail-Life had stolen fuel belonging to Choctaw and used Choctaw's equipment without permission. Based on these false accusations, Union Pacific cancelled its

contracts with Rail-Life, causing Rail-Life to lose income and profits from at least six existing contracts.

In response, Choctaw answered, filed special exceptions, and moved to dismiss under Rule 91a of the Texas Rules of Civil Procedure. Rail-Life amended its original petition and nonsuited most of its claims, leaving only claims against Choctaw for tortious interference with an existing contract and business disparagement. Choctaw withdrew is Rule 91a motion to dismiss, and the trial court entered an order dismissing the other three claims.

Choctaw filed a TCPA motion to dismiss Rail-Life's claims, arguing that Rail-Life's lawsuit was based on or was in response to Choctaw's exercise of the right of free speech and the right to petition. Choctaw maintained that Rail-Life was targeting its constitutional right to speak freely and to petition based on "Choctaw's report to Union Pacific police regarding Rail-Life's improper use of Choctaw's eRailsafe badge." Choctaw argued that Rail-Life's claims "necessarily involve Choctaw's communications with semi-government personnel" about subjects of concern to the public.

Citing Union Pacific's policy and federal laws, Choctaw contended that its communications and report about Rail-Life's wrongful display of an eRailsafe badge belonging to Choctaw were subjects of concern to the public because Union Pacific implemented and enforced a Controlled Access Policy "to meet the U.S. Department

4

of Homeland Security requirements." Within this policy, as Choctaw explained, Union Pacific required all suppliers to display a company-issued eRailsafe badge prior to entering its property for safety reasons. A wrongful display of an eRailsafe badge belonging to another company compromises the safety and security of not only the workers on Union Pacific's worksite, but also the public at large.

Choctaw also asserted that Rail-Life could not establish a prima facie case on each element of its claim of tortious interference with contract, as required by the TCPA to avoid dismissal of its underlying suit against Choctaw. And dismissal of Rail-Life's suit was required because, even if Rail-Life had established a prima facie case, Choctaw had established the affirmative defense of justification to tortious interference with contract. Choctaw did not assert any affirmative defenses for Rail-Life's business-disparagement claim, but it argued that Rail-Life failed to establish the elements of its business-disparagement claim by clear and specific evidence. Choctaw attached evidence supporting its assertions, including Baker's declaration, Union Pacific's Controlled Access Policy, copies of 6 U.S.C. sections 1161 through 1172, and a congressional hearing discussing the effect of background and security clearances on the transportation workforce.

In response, Rail-Life requested that the court deny Choctaw's TCPA motion and asserted that the claims alleged in its amended petition were not the kind that the TCPA covered, but, instead, were based "a pattern of misconduct by [Choctaw]

that evidences the intention to interfere with Rail-Life's contracts with Union Pacific and a pattern of conduct intended to disparage its reputation and business." Rail-Life did not address Choctaw's free-speech arguments. Instead, Rail-Life argued that it could establish a prima facie case on each element of its claims. It referenced the evidence set out in the affidavits of Olmeda and Torres, among other evidence.

Rail-Life also pointed out Choctaw's failure to assert an affirmative defense to its business-disparagement claim. And in explaining why Choctaw failed to establish justification as an affirmative defense to its tortious-interference claim, Rail-Life contended that Choctaw was not justified in engaging in a pattern of intentional misconduct by making "untrue statements" to Union Pacific because Choctaw had failed to prove that its "interference was a good faith claim to a colorable legal right." Rail-Life attached supporting documents to its response, including an email from Olmeda to Union Pacific, stating, in part

> I am touching base with you on the [sic] behalf of the issues/rumors that are taking place[.] I'm not running illegal employees. [T]hey are all up to date. . . . I have all needed [sic] paper work [sic] to present to you or if anyone else would need[,] sir. My guys['] e-rail[safe] badges are processed and awaiting via mail to my office. They will be in this week[,] sir. [A]s soon as [I] receive them[,] I can send them your way via e-mail.

Rail-Life also attached Torres and Olmeda's affidavits, Rail-Life's insurance policy, and equipment rental agreements and receipts, among other things.

In response, Choctaw asserted that it was justified in reporting the misuse of badges to Union Pacific based on state and federal law requirements as well as Union Pacific's policy. It also argued that Rail-Life's evidence confirmed that Rail-Life's employees displayed Choctaw-issued eRailsafe badges to Union Pacific. Choctaw objected to Olmeda's affidavit as untimely and Rail-Life's other evidence as misleading and inadmissible.

The trial court overruled Choctaw's objections and denied Choctaw's TCPA motion. Choctaw filed this interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(12) (authorizing interlocutory appeal of order denying motion to dismiss filed under TCPA Section 27.003).

## Texas Citizens Participation Act

### A. Standard of review

We review de novo the denial of a TCPA motion to dismiss. *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 353 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). When determining whether to dismiss the legal action, the trial court considers "the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE § 27.006(a). We evaluate the basis of a legal action only "by the plaintiff's allegations" and view the evidence in the light most favorable to

7

the nonmovant. *Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017); *Dolcefino v. Cypress Creek EMS*, 540 S.W.3d 194, 199 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

**B.    Applicable law**

The purpose of the TCPA is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE § 27.002. It does so by allowing defendants who claim that a plaintiff has filed a meritless lawsuit in response to the defendant's proper exercise of a constitutionally protected right to seek dismissal of that action, attorneys' fees, and sanctions at an early stage in the litigation. *See Dolcefino*, 540 S.W.3d at 198. Section 27.003(a) of the TCPA provides that a party may move to dismiss a legal action that "is based on or is in response to [that] party's exercise of the right of free speech, right to petition, or right of association." TEX. CIV. PRAC. & REM. CODE § 27.003(a).[2]

---

[2]    Though not applicable to this case, a party may also move to dismiss a legal action that "arises from any act of that party in furtherance of [that] party's communication or conduct described by Section 27.010(b) [of the TCPA]." *Id.*

Choctaw, as the TCPA movant, bears the initial burden of showing by a preponderance of evidence that its underlying suit against Rail-Life is based on or is in response to its exercise of one of the three First Amendment rights listed in the TCPA statute. *Id*. § 27.005(b)(1). If Choctaw meets this burden, then the burden shifts to Rail-Life to establish "by clear and specific evidence a prima facie case for each essential element of" its claims. *Id*. § 27.005(c). Even if Rail-Life establishes a prima facie case for both of its claims, dismissal of the suit is required if Choctaw "establishes an affirmative defense or other grounds on which the moving party [under the TCPA] is entitled to judgment as a matter of law." *Id*. § 27.005(d).

## C.    Applicability of the TCPA to Rail-Life's claims

Choctaw's TCPA motion alleges Rail-Life's suit against it is based on or is in response to Choctaw's exercise of two of its First Amendment rights, the right of free speech and the right to petition. We first address free speech.

Rail-Life alleges that Choctaw tortiously interfered with its contracts with Union Pacific by making "false representations [and] disparaging words regarding, including but not limited to badges, equipment, [and] fuel."[3] Choctaw replies that its

---

[3]    Rail-Life contends that the suit is based on a "pattern of misconduct by Choctaw that evidences the intention to interfere with Rail-Life's contracts with Union Pacific and a pattern of conduct intended to disparage its reputation and business." Rail-Life's allegations—claiming that Choctaw accused Rail-Life's employees of misusing Choctaw-issued security badges and stealing Choctaw's fuel and property—are so intertwined within Choctaw's TCPA motion, Rail-Life's response, and the parties' briefing on appeal without separate analyses for each. We therefore

communications to Union Pacific are of public concern based on federal and state laws requiring rail carriers, like Union Pacific, to enact and enforce policies and procedures for workplace safety and national security.

The TCPA defines "exercise of the right of free speech" as a "communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE § 27.001(3). A "matter of public concern" is defined in one of three ways: "(A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." *Id*. § 27.001(7). Choctaw contends that the third definition of "matter of public concern" applies here. We agree.

The United States Supreme Court has recognized railroads as matters of public concern. *See Union Tr. Co. of N.Y., v. Ill. Midland Ry. Co.*, 117 U.S. 434, 455 (1886) ("[A] railroad is a matter of public concern."); *Dodge Cnty. Com'rs v. Chandler*, 96 U.S. 205, 208 (1877) (noting that railroads are "public highways" and constitute "things of public concern"). Private railroad companies, like Union Pacific, are "quasi-public" entities "engaged in the performance of public duties." *Eckington & Soldiers' Home Ry. Co. v. McDevitt*, 191 U.S. 103, 114 (1903); *see N.*

---

will address their allegations as part of our analysis, to the extent it is necessary for us to do so.

10

*Sec. Co. v. United States*, 24 S. Ct. 436, 445 (1904) (characterizing railroads as "quasi-public corporations"); *Davis v. Kirklen*, 253 S.W. 330, 332 (Tex. Civ. App.—San Antonio 1923, writ dism'd w.o.j.) ("Being quasi[-]public corporations, carriers by rail are granted extraordinary powers with the express view of rendering adequate and impartial service to the public.").

The record shows that Union Pacific developed the eRailsafe badge under its Controlled Access Policy to comply with these requirements under federal law. Title 6 of the United States Code governs domestic security "surface transportation systems" to "enhance the protection of the people, property, and territory of the United States of America against terrorist attacks." 6 U.S.C. § 1101. Surface transportation systems include railroads. *See id*. § 1101(2)(e). Section 1170 mandates that the Department of Homeland Security create rules for railroads to generate procedures for security background checks for "a contractor or subcontractor of a railroad carrier." 6 U.S.C. § 1170(a).

Choctaw asserts that the communications here included its inquiries about whether Rail-Life had violated federal laws, state laws, and Union Pacific's Controlled Access Policy by misusing security access badges—i.e., eRailsafe badges—to gain access to Union Pacific's property; and it argues it made these inquiries in connection with subjects of concern to the public. Choctaw cites Union Pacific's Controlled Access Policy, which states:

11

[Union Pacific] Railroad and the Supplier have a mutual interest in providing a safe workplace for the employees of both parties and in maintaining the integrity and security of Railroad's facilities. To help ensure this goal, the Railroad has instituted a Controlled Access Policy. All persons seeking admission to Railroad property will apply (the "Applicants") for admission to the property. Supplier and its subcontractors, including its personnel and employees, must be in full compliance with the Controlled Access Policy within thirty (30) days of performing Work on Railroad property. Supplier and its subcontractors shall, at their sole cost and expense, conduct background investigations of Applicants prior to their admission to the property. Prior to any new or existing employee or subcontractor of Supplier working at or regularly visit any Railroad facility, Supplier or subcontractor shall register with Railroad's approved risk assessment company (currently eRailsafe is the Union Pacific Railroad approved risk assessment company).

* * * *

D. Applicant is responsible for wearing that badge and carrying another form of government[-]issued ID, at all times, when on Railroad property.

E. Supplier shall be responsible for managing and recovering the Identification Badge from their employees who resign, retire or are terminated.

F. Supplier will be responsible for enforcement of this program, however, both the Railroad and the Federal Railroad Administration may audit for compliance. Should Supplier be found out of compliance, any and all fines or penalties incurred will be the sole obligation of the Supplier.

To avoid potential liability to Union Pacific, Choctaw, like any other supplier, had to report any violations of Union Pacific's policy upon suspecting unauthorized use of its eRailsafe badges. Choctaw contends it was concerned about potential

12

violations because it had not retrieved the Choctaw-issued eRailsafe badges from Olmeda and Torres when they were terminated.

Texas courts have consistently held that communications about potential violations of internal policies and procedures involving health, safety, and environmental risks constitute a matter of public concern. *See, e.g.*, *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 901 (Tex. 2017) (per curiam) ("matter of public concern" established because communications involved an alleged failure to comply with a process known to "reduce the potential environmental, health, safety, and economic risks associated with noxious and flammable chemicals overfilling and spilling onto the ground"); *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509–10 (Tex. 2015) (per curiam) (communications about nurse anesthetist's alleged violations of medical provider's sterile protocol policy was matter of concern to the public).

This issue is much like that in *McDonald Oilfield Operations, LLC v. 3B Inspection, LLC*, 582 S.W.3d 732 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (op. on reh'g). In that case, McDonald sponsored and maintained "Operator Qualifications" showing that the individual employees were qualified under federal standards to perform pipeline monitoring tasks. *Id*. at 736. 3B Inspection alleged that McDonald communicated about cancelling its sponsorship of individual employees' Operator Qualifications. *Id*. at 738. 3B Inspection and the individual employees sued

McDonald for business disparagement, defamation, and tortious interference with a contract based on allegations of false representations and the suspension of its sponsorship to tortiously interfere with 3B Inspection's contracts. *Id*. at 739.

McDonald moved to dismiss under the TCPA. *Id*. at 740. The trial court denied McDonald's motion, and McDonald appealed, arguing that the TCPA applied to its right to free speech because the communications were about either the theft of its equipment or the operation and safety of oil and gas pipelines, implicating a matter of public concern. *Id*. at 746. On review, a panel of this Court held that the TCPA applied to McDonald's exercise of its free-speech rights. *Id*. The communications constituted matters of public concern because they were about "qualifications and sponsorship of the individual employees to perform certain tasks that could impact environmental, health, safety, and economic concerns" associated with the pipeline industry. *Id*.

Like *McDonald*, Rail-Life's communications to Union Pacific and its officers were based on or in response to Choctaw's exercise of its right of free speech. Choctaw's communications were in connection with a subject of public concern because they were about Rail-Life's alleged failure to present eRailsafe badges under a policy implemented for safety and national security to reduce the risk of "terrorist attack on railroad carriers." 6 U.S.C. § 1161(a). Communications about

14

compliance with safety and security standards governed by state and federal laws are matters of public concern.

Because it has been long held that railroads are matters of public concern and because railroad carriers like Union Pacific are quasi-public entities engaged in the performance of public duties have enacted policies in compliance with state and federal laws to protect the public against risks of potential terrorist attacks, Choctaw's communications were made in connection with a matter of public concern.

We conclude that Choctaw has met its initial burden of showing by a preponderance of the evidence that Rail-Life's lawsuit was based on or in response to Choctaw's exercise of its right to speak freely about the violation of laws and policies that could compromise the safety and security of Union Pacific and its employees, suppliers, and contractors. So we need not address Choctaw's alternative argument that Rail-Life's lawsuit was filed in response to Choctaw's exercise of its right to petition. *See McDonald*, 582 S.W.3d at 747; *Coleman*, 512 S.W.3d at 900–01 (oral and written communications made during safety meeting constituted matters of public concern because they involved process established to reduce potential environmental, health, safety, and economic risks).

Because we hold that at least one of Choctaw's constitutional rights invokes the TCPA, we now determine whether Rail-Life has established by clear and specific

15

evidence a prima facie case for each element of its claims for tortious interference with a contract and business disparagement.

**D.      Prima facie case and affirmative defense**

*1.      Standard of review*

To make a showing of a prima facie case, Rail-Life, as the nonmovant under the TCPA, must provide "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam)). In explaining the liberal application of "prima facie proof," the Texas Supreme Court has observed that

> Prima facie proof is not subject to rebuttal, cross-examination, impeachment or even disproof. The evidence as a whole may well show that prima facie proof was misleading or wrong.

*Ruiz v. Conoco, Inc.*, 868 S.W.2d 752, 757 (Tex. 1993) (op. on reh'g).

*2.      Tortious interference with contract*

Rail-Life alleges that Choctaw engaged in a pattern of wrongful conduct aimed solely at interfering with Rail-Life's contracts with Union Pacific by intentionally making false allegations that it had allegedly stolen Choctaw's equipment and fuel and improperly displayed eRailsafe badges belonging to Choctaw. Choctaw concedes it engaged in communications with Union Pacific about Rail-Life's alleged conduct, but it asserts that it was justified in doing so

16

because it was exercising its own contractual and First Amendment rights. Assuming, without deciding, that Rail-Life established a prima facie case for each element of its claim for tortious interference with a contract, we determine whether Choctaw has established an affirmative defense of justification.

Under Texas law, tortious interference with a contract occurs when a party interferes with an existing contract willfully and intentionally and the interference proximately causes actual damages or loss. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 588 (Tex. 2017). "Justification is an affirmative defense to such a claim and 'is established as a matter of law when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights.'" *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 53 (Tex. 2017) (quoting *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 81 (Tex. 2000)). Even so, justification is not an affirmative defense if the plaintiff pleads and proves methods of interference that are tortious in themselves. *Fin. Review Servs.*, 29 S.W.3d at 81.

Although it raises several allegations in support of its tortious-interference claim, Rail-Life does not dispute that Choctaw and Rail-Life were both contractually obligated to comply with Union Pacific's Controlled Access Policy. In fact, Choctaw and Rail-Life, as Union Pacific's suppliers, were "responsible for managing and recovering" eRailsafe badges from their employees who are terminated. They were

17

also "responsible for enforcement" of this policy. Failure to comply with this policy would have subjected Choctaw or Union Pacific to fines or penalties. Thus, Choctaw had the contractual right to suspend Torres and Olmeda's eRailsafe badges after they were terminated. Choctaw also had the contractual right to inform Union Pacific that Torres and Olmeda no longer worked for Choctaw and worked for Rail-Life instead. And, most importantly, Choctaw had the contractual right to engage in communications communicate about the misuse of Choctaw-issued eRailsafe badges when Union Pacific reported that a Rail-Life employee had allegedly displayed a Choctaw-issued badge.

We, therefore, conclude that Choctaw was justified in communicating with Union Pacific about potential violations of the Controlled Access Policy. The trial court erred by denying Choctaw's TCPA motion to dismiss Rail-Life's claim for tortious interference with contract because Choctaw established the affirmative defense of justification as a matter of law. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(d).

### 3. *Business disparagement*

Business disparagement is a tort that "protects economic interests." *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003). To prevail on a business-disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without

18

privilege, (4) that led to special damages to the plaintiff. *See id*. Choctaw contends that Rail-Life failed to produce evidence of three elements of its business-disparagement claim: false and disparaging information, malice, and special damages.

As for the first element, Rail-Life contends that Choctaw made false allegations about Rail-Life employees wrongfully displaying eRailsafe badges belonging to Choctaw to Union Pacific. Rail-Life explains that these allegations were false because Rail-Life had applied for its own badges for its employees. In response, Choctaw argues that Rail-Life's own evidence shows that the statement was true. A showing of truth of an allegedly defamatory statement negates the element of falsity for a business-disparagement claim. *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987) ("Regarding falsity, the common law presumed the defamatory statement to be false and truth was a defensive matter.").

Rail-Life presented evidence, including affidavits, emails, and eRailsafe's website to establish that Choctaw's statement—that Rail-Life's employees presented Choctaw-issued badges to Union Pacific—was false because Rail-Life had applied for badges for its employees and did not need to display badges belonging to Choctaw. According to their affidavits, Torres and Olmeda claimed that Rail-Life "applied and obtained for [eRailsafe] badges for its employees." Rail-Life also introduced two emails from Olmeda to Union Pacific employees stating

19

that Rail-Life had "processed" eRailsafe badges for its employees and that he would provide Union Pacific copies of the badges when he received them by mail. In addition, Rail-Life introduced the status page of eRailsafe's website confirming that Rail-Life's application for employee badges was pending at the time of the emails.

But Choctaw does not dispute that Rail-Life had applied for eRailsafe badges or that the application was pending when Union Pacific requested Rail-Life's employees to display their badges. Nor does Choctaw dispute that Rail-Life had eventually received eRailsafe badges for its employees. Choctaw argues, instead, that Rail-Life's employees displayed Choctaw-issued badges, a statement that Rail-Life claims is false. Torres and Olmeda's affidavits contain an admission that E. Cardona, a Rail-Life employee, showed Union Pacific his badges issued by Choctaw and another company:

> It was on that day that Mr. Zumbrennen—[a Union Pacific employee]—demanded Mr. C[a]rdona to present his badge and Mr. C[a]rdona presented the badge Mr. Cardona had with [Choctaw] and JC Construction. Mr. C[a]rdona explained to Mr. Zumbrennen that Mr. Cardona's badge through Rail-Life was i[n] the process.

After poring over the TCPA record, we conclude that Rail-Life has not met its prima facie burden for its business-disparagement claim because the evidence shows that Choctaw's statement was, in fact, true, negating the "false and disparaging information" element. *See Basic Capital Mgmt., Inc. v. Dow Jones & Co., Inc.*, 96 S.W.3d 475, 480 (Tex. App.—Austin 2002, no pet.) ("A statement that

20

is true or substantially true cannot support a claim for . . . business disparagement."); *see also David Rafes, Inc. v. Huml*, No. 01-08-00856-CV, 2009 WL 3491043, at *4 (Tex. App.—Houston [1st Dist.] Oct. 29, 2009, no pet.) (mem. op.) (explaining truth or substantial truth is defense to falsity element in defamation context). Thus, we conclude the trial court erred by denying Choctaw's TCPA motion to dismiss.

Having concluded that Choctaw was justified in communicating with Union Pacific about the eRailsafe badges for Rail-Life's tortious-interference claim and that Rail-Life did not meet its burden of making a prima facie showing for its business-disparagement claim, we need not address the remainder of the parties' issues, including Choctaw's argument that the trial court made erroneous evidentiary rulings. TEX. R. APP. P. 47.1; *see Universal Plant Servs., Inc. v. Dresser-Rand Group, Inc.*, 571 S.W.3d 346, 363 n.1 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

## Conclusion

Having determined that the trial court erred by denying Choctaw's motion to dismiss Rail-Life's claims under the TCPA, we reverse the trial court's order denying Choctaw's TCPA motion in favor of Rail-Life. We remand the case to the trial court with instructions to dismiss Rail-Life's suit after holding additional proceedings to award Choctaw its court costs, reasonable attorney's fees, and other

expenses incurred in defending against the action as are equitable and just, and any other relief available under the TCPA.[4]

Sarah Beth Landau
Justice

Panel consists of Justices Keyes, Lloyd, and Landau.

---

[4] TEX. CIV. PRAC. & REM. CODE § 27.009(a) (authorizing mandatory award of attorney's fees and court costs for successfully defending TCPA motion); *see Bedford v. Spassoff*, 520 S.W.3d 901, 906 (Tex. 2017) (per curiam) (reversing judgment as to libel claim and remanding to trial court with instructions to dismiss libel claim and award attorney's fees under TCPA); *Schimmel v. McGregor*, 438 S.W.3d 847, 862 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (proper disposition when trial court errs in denying dismissal under TCPA is reversal and remand for Section 27.009(a) award followed by dismissal).